**In re Clarence BERENS and Marlene Berens, Debtors.**

**Bankruptcy No. 4–84–844.**

United States Bankruptcy Court, D. Minnesota.

June 4, 1984.

---

Neil R. Tangen, Marshall & Marshall, Hoffman, Minn., for debtors.

Michael R. Stewart, Faegre & Benson, Minneapolis, Minn., for Swift County Bank.

**ORDER ALLOWING LIMITED USE OF CASH COLLATERAL BY DEBTOR**

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-captioned matter came on for hearing on the motion of the Debtor for

---

**1.** By definition, a lien includes a levy. See section 101(28) of the Bankruptcy Code, 11 U.S.C. § 101(28).

use of cash collateral pursuant to 11 U.S.C. § 363(c)(2). For the reasons outlined below, I am allowing a limited use of cash collateral by the Debtors.

### Facts

1. The Debtors filed a petition in bankruptcy under Chapter 11 of the Bankruptcy Code on March 8, 1984.

2. The Debtors are acting as debtors in possession as no trustee has been appointed.

3. Swift County Bank (Swift) is a creditor of Debtors. Swift County Bank's claim as of March 8, 1984, was $533,983.54.

4. Swift's claim is secured by a fourth lien on Debtor's real estate, a lien on the livestock of Debtor, a lien on Debtor's crops and on Debtor's farm machinery and equipment.

5. The three liens prior to Swift's lien on the real estate are as follows:

| | |
|---|---|
| Bill Abner | $85,000 |
| Farmers Home Administration | $423,000 |
| Lutheran Brotherhood | $90,000 |
| Total | $598,000 |

The value of Debtors' real estate is $653,917.80 as testified to by the Debtor. Therefore, Swift has a mortgage lien valued at $55,917.80.

6. Swift also has a first lien on all of the livestock of the Debtor. Debtors recently sold their livestock (cattle) and are holding $36,000 in checks from the sales.

7. Swift has a lien on all of Debtors' crops which have been harvested and are presently stored. The value of Swift's interest in the stored grain is approximately $80,000.

8. Swift also has a security interest in Debtors' farm machinery and equipment. After deducting prior claims to the equipment, Swift's interest in the equipment is approximately $100,000.

9. Therefore, Swift's total liens are:

| | |
|---|---|
| Land | $55,917.80 |
| Livestock | $36,000.00 |
| Crops | $80,000.00 |
| Machinery | $100,000.00 |
| Total | $271,917.80 |

10. Interest is accruing on the prior secured debts in the approximate amount of $192.83 per day. Interest is accruing on Swift's loans at the rate of $179.94 per day.

11. Debtors' machinery and equipment, if used by the Debtors to farm any land this year will depreciate to some extent.

12. Real estate taxes will accrue on Debtors' land during 1984.

13. Debtors request use of the following cash collateral:

| | |
|---|---|
| Cattle Sale Proceeds | $36,000 |
| Stored Grain to be sold | $80,000 |
| Total | $116,000 |

All of the cash collateral Debtors request use of has a first lien in favor of Swift.

14. Debtors want to use the cash collateral to plant their 1984 crop of soybeans.

15. Debtors offer Swift, as adequate protection, a replacement lien on the 1984 crop to be grown in the amount of $136,000.

16. Debtors propose to farm 750 acres of their own home farmland and to farm 575 acres of rented land. Of the home farmland, 150 acres will be irrigated. Of the rented land, 300 acres will be irrigated. The cost of planting and harvesting soybeans on the 1,325 acres will be approximately $175,000. Debtors only have $116,000 of cash collateral, so there is a deficiency of $59,000 of the amount necessary for planting.

17. Debtors propose to compensate for the deficiency by obtaining trade credit from suppliers or by not fertilizing the croplands or by renting part of Debtors' home farmland. Swift produced at the hearing an affidavit from one of Debtors' suppliers stating it would not offer trade credit.

18. The cost of Debtors farming the 525 acres of rented land would be, according to Debtors, as follows:

| | | |
|---|---|---|
| Rent for land | $45,000 | |
| Seed, fertilizer & herbicide | $30,475 | ($53 per acre) |

| | | |
|---|---|---|
| Fuel costs | $5,750 | ($10 per acre) |
| Labor | $10,000 | |
| Irrigation | $8,000 | |
| Repairs for equipment | $7,000 | |
| Total | $106,000 | |

19. The costs detailed in paragraph 18 above do not include crop insurance. Hail insurance will cost $15,960 for the rented land and approximately $10,000 for the home farmland. It is too late to get all risk insurance. No depreciation of equipment is figured into the above costs.

20. Debtor testified that their 1984 soybean crop yield would be between 15 and 40 bushels per acre. Twenty-seven bushels per acre would be an average yield. Soybeans are being sold at $8.50 per bushel now. The fall future price for soybeans is $7.00 per bushel now. If Debtor has an average yield on the rented land of 27 bushels per acre, he would gross $108,675. If he had a yield of 40 bushels per acre, he would gross $161,000. If he had a yield of 15 bushels per acre, he would gross $60,375.

21. Debtor would, if the 1984 crop year is an average year, show a loss on the crops grown on the rented land. This is determined as follows:

| | |
|---|---|
| Debtors' estimate of cost to farm rented land | $106,000 |
| Cost of insurance (Hail insurance only) | $15,960 |
| Total Cost to farm during 1984 crop year | $121,960 |
| Gross yield (at 27 bushels per acre) | ($108,675) |
| Loss | ($13,285) |

In a year where Debtor had a high 40 bushel per acre yield, his profit from the rented land would be $39,040. In a year where Debtor had a 15 bushel per acre yield, his loss would be more than $40,000.

22. Debtors need approximately $69,000 to plant and harvest their 1984 crop on the home farmland. The gross yield on the home farmland at $7.00 per bushel would range from $78,750 to $210,000. A 27 bushel per acre yield would gross $141,750.

23. Swift consents to Debtors' use of $69,000 of cash collateral to plant and harvest a crop in 1984 on their home farmland of 750 acres only.

### Discussion

Debtors request use of cash collateral under 11 U.S.C. § 363(c)(2)(B). The proceeds from the sale of livestock and grain are cash collateral under 11 U.S.C. § 363(a) since the proceeds are "cash". Swift County Bank objects to the use of the cash collateral by the Debtors and demands adequate protection if such use is allowed under 11 U.S.C. § 363(e). Swift County Bank has a first lien on all of the collateral to be used.

### Adequate Protection

Swift County Bank demands adequate protection. Overall, the Bank appears to be undersecured and has, in fact, admitted that to be true for purposes of this hearing. However, the Bank's undersecured position is not a concern at this hearing. The only assets to be adequately protected at this point in the case are the $116,000 of cash collateral which Debtors propose to use. This money is clearly secured by a first lien to the Bank.

Debtors have the burden of establishing that adequate protection exists for the secured party. 11 U.S.C. § 363(e). Debtors have offered a $136,000 replacement lien in crops to be grown in 1984. Swift County Bank rejects this adequate protection offer. It consents only to use of $69,000 of cash collateral to grow crops on the home farm of Debtors with a replacement lien in those crops.[1]

### HOME FARM

I find, whether Swift County Bank consents or not, that Debtors have offered adequate protection as to the use of cash collateral to plant and harvest a 1984 crop on the home farm. The potential yields

---

1. Swift County placed various constraints on the consensual use of the $69,000 in their proposal, including acceptance by May 30, 1984. None of these constraints are to be read into this Court's order except as specifically indicated.

from the home farm result in a profit even if 1984 is a bad year and crop yields are as low as 15 bushels per acre. In an average year, the projected profit is over two times the cost of planting and harvesting. These facts give the Bank a reasonable assurance of obtaining a return of their cash collateral. In fact, in a successful year, the Debtors might well be able to significantly reduce their debts. It is important, if the Debtors are to reorganize, that they be allowed to continue their farming operation at least on their own land.

From the evidence adduced at the hearing, it appears that the cost of hail insurance on Debtors' home farm will be approximately $10,000. Even factoring this cost into Debtors' farming costs on the home farm puts Debtors in a break-even position at a 15 bushel per acre yield. Therefore, due to the importance of the home farm to the Debtors' reorganization and the reasonable likelihood of at least breaking even during the 1984 crop year in relation to the $69,000 of Swift County Bank's cash collateral to be used, I find Swift to be adequately protected.

## RENTED LAND

■ The situation as to the rented land is different. In an average yield year (27 bushel per acre), Debtors will lose money on the crops grown on the rented land. If Debtors yield 32 bushels per acre which Debtor testified they averaged over the last two years, Debtors still have a profit of only $6,000 to $7,000. This margin of error for a normal crop year is too small to constitute adequate protection. The possibility of bad weather, disease, lower crop prices and other risks are too great to allow Debtors to use Swift's cash collateral on the rented land. The likely margin of profit is not great enough. The rental price of the land really weighs heavily in the balance here. The sum of $45,000 to rent 575 acres drastically cuts the profits to be obtained by Debtors.

The fact that all risk insurance is not obtainable now by Debtors is also a factor in my decision. If Swift were able to be assured of a *guaranteed* return on the rented land sufficient to cover the higher costs of planting and rental, the results might be different. Hail insurance alone is not such a guarantee. *In re Thomas Nikolaisen and Claudia Nikolaisen,* 38 B.R. 267, 11 B.C.D. 977 (N.D.1984).

The fact that Debtors fall $59,000 short in meeting their admitted cash needs to farm both the home farmland and rented land is very significant also. The proposed means of meeting that shortfall testified to by the Debtor significantly decrease crop yields and therefore profit potential.

Debtors cite the case of *In re Stein,* 19 B.R. 458 (E.D.Penn.1982) as proof that their offer of adequate protection is sufficient. In that case, evidence was produced to show that the value of the secured parties' security was increasing. That has not been shown in this case to my satisfaction as to the rented land. In that case, the Debtors were only continuing to farm their home farm. Also, in the *Stein* case, *supra,* the Debtors owned a dairy herd which was continuing to reproduce and to produce milk. In this case, Debtors have sold their cattle and that money constitutes part of the cash collateral to be used herein.

The *Alyucan Interstate Corporation* case, 12 B.R. 803 (Utah 1981) also cited by Debtors involved a motion to lift the automatic stay under 11 U.S.C. § 362. Debtors rely on the case to define what adequate protection should be in this case. The issue as to adequate protection is a different one in a § 362 motion to lift the automatic stay. If the stay is not lifted, the creditor still has a security interest in the bargained for and existing collateral. If the automatic stay is lifted, the creditor receives the collateral itself. In a cash collateral hearing under § 363, if the Debtor is allowed to use the cash collateral, the creditor's security—the collateral—is gone. No longer does the secured party have the asset it originally bargained for as collateral available to it. If the use of cash collateral is denied, the secured party has the collateral, or its cash equivalent, in hand or being held for its benefit. In other words, in an auto-

matic stay situation, the creditor does not lose its collateral; its possession of the collateral is merely delayed. In an 11 U.S.C. § 363 Motion, the collateral is actually used up.

Therefore, the standard of adequate protection to be afforded a creditor when its cash collateral is being used should be a high one. Replacement liens in "hard assets" such as land or other minimally depreciable assets would be in most instances sufficient. However, to me, a lien in a crop to be grown with all of the other risks attendant to that is not sufficient adequate protection except where a significant profit margin is very likely or a minimal guarantee of payment is proffered through crop insurance. To ask a creditor to release cash requires a strong likelihood of return. The uncertainties of the weather, crop prices, and all the other uncertainties inherent in farming increase the insecurity of a replacement lien solely in crops to be grown. When the cash collateral proposed to be used falls $59,000 short of the funds needed to plant and harvest the planned crop, the risks of failure are higher yet. As stated in the case of *In re Glenn L. Myrvold and Janet E. Myrvold* (unreported decision, D.Minn., Judge Robert Kressel, March 10, 1983):

"The risk of these uncertainties in general farm and market conditions have always fallen on the farmers, and I am afraid that in the context of the bankruptcy case, uncertainty is again the farmer's enemy." (Page 8–9).

THEREFORE, IT IS ORDERED:

1. That the Debtors' request for use of cash collateral is granted to the following extent:

a. Debtors may use up to $69,000 of the cash collateral presently in their possession consisting of $36,000 representing proceeds from the sale of cattle and $80,000 of grain to be sold.

b. Debtors may use said cash collateral to plant and harvest a crop and do all things necessary to accomplish that on Debtors' home farm during the year 1984.

c. Swift County Bank is granted a replacement lien of $69,000 as and for adequate protection pursuant to 11 U.S.C. § 363(e), said lien being a first lien upon the 1984 crops to be grown by Debtors on the home farm.

d. Debtors shall obtain hail insurance for the crop to be grown on the home farm.

e. Debtors shall provide Swift with such reports and information as to the use of their cash collateral as Swift County Bank may reasonably request from time to time.

2. Debtors' use of cash collateral in order to plant and harvest a crop on rented farmlands for the crop year 1984 is denied.