**In re FEATHER RIVER ORCHARDS, a California limited partnership, Debtor.**

**Bankruptcy No. 285–02161–D–11.**

United States Bankruptcy Court, E.D. California.

Feb. 3, 1986.

Michael S. McManus, Felderstein, Rosenberg & McManus, Sacramento, Cal., for debtor.

Ronald H. Sargis, Hefner, Stark & Marois, Sacramento, Cal., James E. Armstrong, Bank of America San Francisco, Cal., for creditor, Bank of America, N.T. & S.A.

## MEMORANDUM OPINION
## AND DECISION

LOREN S. DAHL, Bankruptcy Judge.

Debtor-in-possession (debtor) filed its petition under Chapter 11 of the Bankruptcy Code on June 7, 1985. It is engaged in the business of farming, including the growing and harvesting of walnuts, peaches and prunes. Prior to the filing of this case, debtor had obtained from the Bank of America National Trust & Savings Association (Bank) loans in the approximate aggregate sum of $1,910,000.00, having a balance of $2,047,011.00 as of November 1985, with interest accruing thereafter at $732.00 per day, or $267,180.00 per year.

These loans are secured by Bank's security interest in debtor's crops, proceeds from the sale of crops, and equipment. The present cash collateral represents the proceeds of the 1984 and 1985 crops in the form of $350,000.00 in a bank account and accounts receivable of $1,274,000.00 of which $146,000.00 is doubtful of collection. The debtor requests permission to use approximately $1,891,099.00 of the crop proceeds and accounts receivable from debtor's 1984 and 1985 crop to produce its 1986 crop, for which debtor proposes to provide the Bank with a replacement lien in the 1986 crop and crop proceeds. The debtor contends that the Bank will be adequately protected because it will be secured by a lien on crops which debtor expects to be worth approximately $1,954,000.00 at harvest in 1986.

The land upon which the crop is to be grown is encumbered by a first deed of trust in favor of Prudential Life Insurance Company in the approximate sum of $3,875,000.00, with interest of $520,800.00 payable in May 1986.

The Bank vigorously resists debtor's motion contending among other things that debtor's proposal will not provide the benefit of its bargain nor the indubitable equivalent of its interest in the property and hence will not be afforded adequate protection to which it is entitled under the Bankruptcy Code.

One of the issues presented by this motion is whether the bankruptcy court can permit a debtor-in-possession to use the cash collateral accumulated from crop proceeds of one year to propagate and harvest the crops of the following year.

The only circuit court of appeals' case dealing with this subject which has been cited to this court is *In re Martin*, 761 F.2d 472 (8th Cir.1985). *Martin* involved the debtor's application to use cash collateral (grain from prior years in storage subject to a mortgage) to plant and harvest the 1984 crop. The court did not find the use of cash collateral from a prior year in itself a bar to its use in planting and harvesting a subsequent year's crop. After reviewing 11 U.S.C. Section 363(e) which provides that the use of property by the trustee (debtor-in-possession) in which a creditor has an interest must be requested conditioned on adequate protection of the creditor's interest being afforded by the debtor, *Martin* went on to say:

> ... Section 361 provides three alternative means for providing adequate protection. 11 U.S.C. Section 361. Subsection 1 provides for periodic cash payments; subsection 2 provides for additional or replacement liens. Subsections 1 and 2 are designed to compensate for any decrease in value of a secured creditor's interest resulting from the use, sale or lease of the debtor's property. Subsection 3 provides for "granting such other relief * * * as will result in the realization by [the creditor] of the indubitable equivalent of [its] interest in such property."

We find the inclusion of the phrase "indubitable equivalent" in section 361(3) most significant. The concept originated from an early bankruptcy case, *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935), in which Judge Learned Hand explained the meaning of "adequate protection" within the context of the Bankruptcy Act of 1889:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a credi-

tor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence. *Id.* at 942.

A review of the legislative history leads us to conclude that a debtor, in structuring a proposal of adequate protection for a secured creditor, "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *In Re American Mariner Industries,* 734 F.2d 426 at 435. Although the adequate protection standard and its requirement of indubitable equivalence remains constant, whether adequate protection exists in a given case depends upon the nature of the collateral and the nature of the debtor's proposed use of that collateral.

In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard. This flexibility, however, must not operate to the detriment of the secured creditor's interest. In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence. *See In Re George Ruggiere Chrysler-Plymouth,* 727 F.2d 1017 at 1019. ("In determining whether a creditor's secured interests are so protected, there must be an individual determination of the value of that interest and whether a proposed use of cash collateral threatens that value.")

The *Martin* court holds that the bankruptcy court must establish the value of the creditor's security interest and that proof of value of the lien offered in replacement requires more substantial evidence than merely the debtor's estimates of the unplanted crop yield and future market price.

In assessing the risks associated with an adequate protection plan which proposes a replacement lien in not yet existent crops, the *Martin* court suggested a bankruptcy court consider the following:

[T]he anticipated yield in light of the productivity of the land; the husbandry practices of the farmer, including his proven crop yields from previous years; the health and reliability of the farmer; the condition of the farmer's machinery; whether there are encumbrances on the machinery which may subject it to being repossessed before the crop is harvested; the potential encumbrances on the present or future crop by other secured creditors; the availability of crop insurance and the risk of crop failure not covered by the crop insurance; and the anticipated fluctuation in market price of the farmer's crop.

The bankruptcy court may consider other factors such as whether a default on a senior encumbrance on the land to be planted could jeopardize the creditor's replacement security in the growing crop; the amount of interest and other expenses which will accrue by reason of the delay in repayment; the effect of adverse weather conditions, pest invasion and disease.

■ Although some courts have differed, the *Martin* court has come down with the majority in holding that the ultimate determination of adequate protection is a question of fact for the trial court to ascertain. This court concurs and will address the question accordingly.

Both the debtor and the Bank have presented a great deal of evidence for the court to consider by way of exhibits, declarations under penalty of perjury and the testimony in court of lay and expert witnesses. As is many times the case, some of the evidence is cumulative, but on the whole counsel for the respective parties have rendered outstanding service to their clients and have conducted themselves with

superior professional competency throughout this contested motion.

Shortly before concluding its opinion, the *Martin* court leaves us with this judicially crafted swan song:

> The concerns we express are not insurmountable. On the contrary, we believe they are in accordance with the policy of balancing the competing interests of a debtor who proposes to use secured property to contribute to the reorganization plan on the one hand, and the creditor who wishes to retain the value and safety of its security interest on the other. After considering the value of the secured creditor's interest and the risks associated with the debtor's proposal, the bankruptcy court must ultimately decide whether the debtor's adequate protection proposal provides protection to the creditor consistent with the concept of indubitable equivalence. Indubitable equivalence requires "such relief as will result in the realization of value." *See In re Sheehan*, 38 B.R. 859, 864 (D.S.D.1984). If the debtor's proposal provides adequate protection, the request for use of cash collateral should be granted by the bankruptcy court. If the debtor's proposal can be modified to provide for adequate protection while still remaining useful to the debtor, the debtor's request should be granted under the modified plan. If adequate protection cannot be afforded under any circumstances, the debtor's request for use of cash collateral should be denied by the bankruptcy court.

## DISCUSSION

The testimony of three experts, all farming management specialists, was adduced. Ross Sanborn and Edward A. Yeary testified for the debtor and Floyd Perry for the Bank. Mr. Yeary and Mr. Perry both impressed this court with their analysis of the debtor's orchards. Mr. Sanborn's testimony, although less analytical, concurred with Mr. Yeary's estimate which was that with quality management and cultural practices, the orchards in 1986 should produce 5,250 tons of peaches at $185.00 per ton, 900 tons of prunes at $650.00 per ton, and 425 tons of walnuts having a market value at $850.00 per ton for a gross monetary yield of $1,917,500.00. Mr. Perry, on the other hand, estimated that the orchards in 1986, with quality management and cultural practices, should produce 4,200 tons of peaches at $180.00 per ton, 925 tons of prunes at $600.00 per ton, and 400 tons of walnuts at $800.00 per ton for a gross monetary yield of $1,631,000.00. As they both acknowledged, the final fiscal yield is dependent upon the actual crop yield as well as the prevailing market price for the 1986 crop. Neither estimate allows for any crop failure in whole or in part from adverse weather conditions, pests, disease or deficient husbandry practices of the debtor. The debtor advises that crop insurance is not available. Nor do these estimates allow for a further decline in market price below $800.00 per ton. As pointed out in the Bank's memorandum of points and authorities in opposition filed November 22, 1985, the debtor expects to spend from $1,891,099.00 to $1,895,784.00 to produce the 1986 crop. This cash outlay includes a projected payment of $520,800.00 to Prudential, the senior lien on the land, but nothing to the Bank on its debt. The two experts estimate the crop yield at future market price to be from $1,631,000.00 to $1,917,500.00. In addition to the crop, the debtor projects $170,000.00 in other income. The details of this other income and risks or uncertainty of earning and collecting it, if any, have not been revealed. It is, however, clear that debtor's budget projection of income must be substantially realized to avoid a loss for the 1986 crop year. Even then, the profit realized will be less than $27,000.00. *See In re Berens*, 41 B.R. 524, 528 (Bankr.Ct.D.MN 1984).

Speaking of the possibility of a loss, the testimony of the debtor's president acknowledged losses for prior years as follows:

| | |
|---|---|
| 1981 | $ 543,536 |
| 1982 | 882,208 |
| 1983 | 1,021,155 |
| 1984 | 688,489 |
| Total | $3,135,388 |

The debtor did not report as to profit or loss for 1985, but the court infers that if it was significantly profitable, a declaration or testimony would have been adduced to that effect. Nonetheless, and notwithstanding the debtor's proffered excuses for the four years of losses, this fact enshrouds the prospect of a profitable 1986 farming operation by the debtor with funereal gloom. This court can have little confidence in the farm management skills of the debtor and officers in light of its past record; undoubtedly the Bank has reached the same conclusion, as evidenced by its declination to voluntarily loan further sums to the debtor and by its vigorous opposition to an "involuntary loan of its cash collateral" by this motion.

As we have seen, the Bank is entitled to the indubitable equivalent of its present interest as a condition of permitting the use of its cash collateral without its consent. At present, the Bank has "real collateral" for its debt of $2,047,011.00, plus interest from November 27, 1985. It has a first lien on the 1985 crop proceeds (and a portion of 1984) in the nature of $350,000.00 cash in bank and accounts receivable from marketing associations, of which the amount due has been determined to be $1,274,000.00 and of which $146,000.00 is doubtful of collection, leaving $1,128,000.00 which can be reasonably certain of payment in the near future. In addition, the Bank has a first lien on the debtor's equipment and machinery, the value of which is unknown to this court, except for the debtor's Schedule B-2 listing at $1,211,220.00, and personal guarantys of some of the corporate officers of unknown value.

Thus, the Bank at present may appear to be fully secured or almost so. But, the present value of its interest is not equal to the balance owing to it for a sophisticated investor would not pay the Bank the amount of its loan balance in exchange for its note and security. However, comparing the Bank's present position with the proposal of the debtor, namely, that the Bank be given a lien on the non-existent 1986 crop in exchange for a release of its lien on the 1984 and 1985 crop proceeds, would greatly reduce the value of the Bank's interest considering, as one must, the uncertainties and speculation as to the future value of the 1986 crop. *See First Bank of Miller v. Wieseler*, 45 B.R. 871 (D.S.D. 1985).

## CONCLUSION

Consequently, this court finds that the debtor's proposal for the use of the Bank's cash collateral does not provide the Bank with the indubitable equivalent of its present security interest in debtor's property and thus does not afford adequate protection to the Bankruptcy Code.

Accordingly, the debtor's motion for use of cash collateral must be and is hereby denied.

IT IS SO ORDERED.