**In the Matter of LUNDELL FARMS, Debtor.**

**Bankruptcy No. MM11–87–02620.**

United States Bankruptcy Court, W.D. Wisconsin.

May 13, 1988.

Sheree Gowey, Asst. U.S. Atty., Madison, Wis.

Denis P. Bartell, Steven J. Kirschner, Ross & Stevens, S.C., Madison, Wis., for debtor.

Kristi McKittrick, Madison, Wis., for creditor, John Lundell.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

This matter raises the issue of whether Commodity Credit Corporation may exercise a claimed right of setoff against property of the bankruptcy estate. The debtor and various of its general partners have sought to use the disputed funds in their farming operations and have resisted the setoff.

The resolution of legal issues has been hindered by incomplete evidence. One fact that can be stated with certainty is that on October 1, 1987, Lundell Farms, a partnership, commenced a case under chapter 11 of the Bankruptcy Code. The exact composition of the partnership is not clear. No partnership agreement has been presented to the court as evidence or otherwise. However, Commodity Credit Corporation ("CCC") claims that Howard Lundell ("Ho-

ward"), John Lundell ("John"), and Dennis Lundell ("Dennis") were the general partners in 1982, when the partnership entered into a grain storage agreement. The petition filed to commence this case states Lundell Farms is now comprised of Dennis, his wife Debra Lundell ("Debra"), Howard, and his wife Elna Lundell ("Elna"). The filed statement of financial affairs explains the history of the partnership as:

> In approx. 1983, debtor was briefly engaged in a business known as Terrafuel. The partners of Lundell Farms have been the above named individuals since its inception; in 1971, John and Karen Lundell joined Lundell Farms Partnership; said individuals sold their interest in the partnership in January 1983.

The "above-named individuals" are Dennis, Debra, Elna, and Howard. In light of this explanation, it is unclear why Elna and Debra were not listed as general partners on the 1982 grain storage agreement.

A central concern of the present motion is the debt Lundell Farms owes CCC arising from a grain storage loss. The exact date of the loss is unclear. CCC claims the loss arose in July, 1983, the debtor claims 1984, but they agree the debt arose well before October 1, 1987. The grain loss debt remained substantially unpaid when this case was commenced. On or about September 14, 1987, Howard, Dennis, and Lundell Farms were placed on the "debt register" for non-payment of this debt. (*See* U.S. exhibit 15). Both partners sought, but failed, to negotiate their removal from the register.

At the time of filing, there were five contracts existing with CCC signed by Lundell Farms partners. Those contracts include:

1. A contract to participate in the 1986 price support and production adjustment programs between CCC and Dennis dating from April 1986 (U.S. Exhibit 10). Debra and Howard are also signatories to this contract.

2. A contract to participate in the 1986 price support and production adjustment programs between CCC and Howard dating from May, 1986 (U.S. Exhibit 11). Elna is also a signatory;

3. A conservation reserve program contact between [1] CCC and Howard, Elna, Dennis and Debra, dating from August, 1986 (U.S. Exhibit 12);

4. A conservation reserve program contract between CCC and Howard, Elna, Dennis and Debra, dating from February, 1987 (U.S. Exhibit 13);

5. A contract to participate in the 1987 price support and production adjustment programs between CCC, Dennis, Debra, Howard and Elna, dating from April, 1987 (U.S. Exhibit 17).[2]

The following amounts were payable under the contracts to the parties identified:

|  | Howard | Elna | Dennis | Debra |
|---|---|---|---|---|
| U.S. Exh. 10 |  |  | $10,901.46 |  |
| U.S. Exh. 11 | $10,916.44 |  |  |  |
| U.S. Exh. 12 | 2,885.75 | $2,885.75 | 2,885.75 | $2,885.75 |
| U.S. Exh. 13 | 671.75 | 671.75 | 671.75 | 671.75 |
| Totals | $14,473.94 | $3,557.50 | $14,458.96 | $3,557.50 |

The amounts due under the contracts became ascertainable as of October 1, 1987, the date of Lundell Farm's bankruptcy filing. All amounts shown as due to Elna and Debra have been paid and CCC is not making any claim against either of them. On schedule B–3—property not otherwise scheduled—these contracts are listed as "Government (Farm) Entitlement Programs" with a value of $30,000.00.

The matter now before the court is the debtor's motion for turnover of the farm program payments due Howard and Dennis. In response, the United States of America acting on behalf of CCC has counterclaimed that it has the right to setoff $28,932.90 owed to Dennis and Howard against the grain storage loss debt and has requested relief from the automatic stay.

---

**1.** The CRP contracts provide specific proportional (25%) allotments to the four partners.

**2.** No payments currently are due under the contract to participate in the 1987 price support and production adjustment programs.

Some understanding of the Price Support and Conservation Reserve Programs is necessary to analyze the issues presented. The Price Support and Adjustment Program, authorized at Title 7, United States Code, Section 1441, *et seq.* is part of the government effort to stabilize grain prices by providing incentives for limiting the production of certain crops. Deficiency payments are made to farmers who limit their production. In essence, a deficiency payment is a subsidy, calculated by a formula, which provides the farmer with supplemental income in exchange for the opportunity to market crops. Governing regulations for the program are found at 7 CFR § 713.1, *et seq.* Deficiency payments are specifically governed by section 713.108, as amended at 51 Fed.Reg. 21833 (1986).

When a farmer enters the program, she signs a contract which, along with the cited regulations, sets forth the farmer's and the government's rights and obligations. The farmer agrees to refrain from planting crops on a portion of her farm and to devote the nonproductive areas to conservation practices. The government in turn agrees to make deficiency payments. In the contract both parties agree to the specific formula by which deficiency payments will be made. Except for the national weighted average market price, all elements necessary to ascertain the deficiency payment are known and agreed. After the contract is signed the only performance required of the farmer is that she not grow the specified crops and that she carry out certain minimal conservation practices. Neither the right to the deficiency payment nor the exact amount of the payment are dependent upon any other performance by the farmer, although the farmer is required to file compliance reports by July 15. (Howard and Dennis did file their reports by

July 15, 1987). The final deficiency payments are made on or after October 1 of each year of the contract.

The Conservation Reserve Program (CRP) is similar to the Price Support Program. Under CRP the farmer receives a yearly rental payment from CCC in return for implementing a ten year conservation program. The farmer is barred from harvesting any crops from the land or utilizing it for grazing purposes. She must plant cover and eradicate noxious weeds. The farmer receives annual rental payments after October 1 of each year of the contract period.

SETOFF

■ The basic question to be resolved is whether CCC can offset the debt it owes to Lundell Farms against the grain-storage claim Lundell Farms owes CCC.[3] A creditor's right to setoff in bankruptcy is governed by in 11 U.S.C. § 553(a) which provides in relevant part:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

It is not necessary that the debts and claims be of the same character for setoff to be permitted. The only requirements are (1) the debts and claims must be mutual, and (2) they must be pre-petition. *In re Braniff Airways, Inc.*, 42 B.R. 443, 447, 12 C.B.C.2d 610 (Bankr.N.D.Texas 1984). In order to substantiate the right to setoff, the creditor must establish the following:

---

**3.** At the outset it should be noted that any change in the composition of the partnership did not affect CCC's equitable right to setoff. The storage grain loss arose sometime in July, 1983 or 1984, and thus, the change in the partnership January, 1983, is inconsequential to this argument.

In addition, while the Uniform Partnership Act (WIS.STAT. § 178.26(5)) indicates the part-

nership would dissolve upon a bankruptcy filing by the partnership, there is good authority that filing bankruptcy does not automatically dissolve a partnership under the Uniform Partnership Act. *See In re Safren*, 65 B.R. 566, 14 B.C.D. 1261, 16 C.B.C.2d 315 (Bankr.D.Cal. 1986).

1. A debt owed by the creditor to the debtor which arose prior to the commencement of the bankruptcy case;

2. A claim of the creditor against the debtor which arose prior to the commencement of the bankruptcy case; and

3. The debt and claim are mutual obligations.

*In re Brooks Farms,* 70 B.R. 368, 371, 15 B.C.D. 674 (Bankr.E.D.Wis.1987) citing *In re Fred Sanders Co.,* 33 B.R. 310 (Bankr. E.D.Mich.1983); *In re IML Freight,* 65 B.R. 788, 793 (Bankr.D.Utah 1986); *In re Morristown Lincoln–Mercury, Inc.,* 42 B.R. 413 (Bankr.E.D.Tenn.1984). *See also In re Taylor Motors,* 60 B.R. 760 (Bankr.D. Nev.1986).

There is no doubt that in a general sense the debtor and CCC have claims against each other. The question then is whether those debts are "mutual." The term "mutual debt" as used in section 553(a) is not defined in the Bankruptcy Code, but has been interpreted by courts to require that the debts "must subsist or be owing between the same parties, in the same right or capacity, and must be of the same kind or quality." *Braniff,* 42 B.R. at 449. In a bankruptcy context, mutuality is particularly important:

Because the debtor and the debtor-in-possession are separate and distinct entities, the courts have concluded that the requisite element of mutuality of parties is lacking whenever a creditor attempts to offset pre-petition debt against a post-petition claim.

*Id.* This distinction is further grounded in the language of section 553 which requires claims and debts to be pre-petition.

There is no dispute that the debtor's grain storage debt owed to CCC arose prepetition. It is less clear whether the debts from CCC to Howard and Dennis arose before or after this case was filed on October 1, 1987. Since the actual amount of the deficiency payment due was not ascertainable until October 1, 1987, the debtor claims it lacks the required mutuality. CCC contends that only the amount was uncertain, while the obligation to pay was fixed before the case was filed.

The overwhelming majority of courts faced with similar arguments regarding Agricultural Stabilization and Conservation Service ("ASCS") contracts have concluded that a final pre-petition determination of the deficiency amount is unnecessary. *See In re Greseth,* 78 B.R. 936, 942 (D.Minn. 1987); *In re Buske,* 75 B.R. 213, 216 (Bankr.N.D.Tex.1987); *In re Pinkert,* 75 B.R. 218 (Bankr.N.D.Tex.1987); *In re Parrish,* 75 B.R. 14 (N.D.Tex.1987). A majority of these courts have adopted the rationale, articulated in *Moratzka v. United States Agricultural Stabilization and Conservation Service (In re Matthieson),* 63 B.R. 56 (D.Minn.1986), that the obligations are created at the inception of the contract, which usually occurs pre-petition. *Matthieson* involved the appeal of six consolidated chapter 7 cases. The terms and conditions of the contracts involved under the Federal Crop Deficiency Program are similar to the conditions of the Price Support and CRP contracts at issue here.[4]

In concluding that the obligations arose pre-petition the *Matthieson* court reasoned:

The creditor's 'right to setoff may be asserted in a bankruptcy case even though at the time the petition is filed

---

**4.** The principal terms of the Federal Crop Deficiency Program:

... required that the debtors refrain from planting crops on a specified portion of their tillable acres and further required debtors to maintain soil conservation practices on the unused acreage. Additional requirements included the filing of certain reports showing compliance with the program's terms and an evaluation of compliance by a local ASCS committee. In exchange, ASCS agreed to pay the debtors a deficiency payment if the final deficiency calculation would be greater than

zero. Such deficiency payment was to be based upon a predetermined formula and was dependent upon the end-of-the-year market prices. Consequently, the deficiency payments were due on or about April 1, 1985. Under the formula, it was possible that any particular deficiency payment might have been zero. Subsequent to enrollment in the program, but prior to April 1, 1985, the debtor in each of the consolidated cases filed a petition for relief under Chapter 7 of the Bankruptcy Code.

*Matthieson,* 63 B.R. at 58.

[the debt] is absolutely owing but not presently due, or where a definite liability has accrued but is as yet unliquidated.' *Traders Bank of Kansas City v. Stonitsch (Matter of Isis Foods, Inc.)*, 24 B.R. 75, 76 (Bankr.W.D.Mo.1982); *Whitman v. Seedtec International, Inc. (In re Whitman)*, 38 B.R. 395, 397 (Bankr.D.N.D.1984); Where an obligation exists prior to bankruptcy, it is irrelevant that the exact amount of liability will not be determined until after the bankruptcy petition was filed. *Michigan Consolidated Gas Company v. Fred Sanders Company (Matter of Fred Sanders Co.)*, 33 B.R. 310, 3122 (Bankr.E.D.Mich.1983). *See also Wilson v. Internal Revenue Service, (In re Wilson)*, 29 B.R. 54, 56–68 (Bankr.W.D.Ark.1982).

Similarly, the court also rejects the Trustee's related contention that the deficiency program agreement contained several conditions precedent which could not have been met until after the bankruptcy petition were filed. In this regard, the Trustee asserts that the conditions precedent include the set-aside requirements, the soil conservation requirements, the filing requirements, and the final determination that a deficiency in fact exists.

A condition precedent is any fact or event, subsequent to the making of a valid contract, which must exist or occur before a right to immediate performance can arise under the contract. *Carl Bolander & Sons Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974); A. Corbin, *Corbin on Contracts* § 628 (1960). 'A condition precedent ... is to be performed before the agreement of the parties becomes operative. A condition precedent calls for the performance of some act or the happening of some event after the contract is entered into, and upon the performance or happening of which its obligation is made to depend.' *Lake Company v. Molan*, 269 Minn. 490, 498–99, 131 N.W.2d 734, 740 (1964). A condition precedent is to be distinguished from a promise in that it creates no rights or

duties in and of itself but is merely a limiting or modifying factor. *In re Lee*, 35 B.R. 663, 665 (Bankr.N.D.Ohio 1983), *citing* S. Williston, *A treatise on the Law of Contracts*, § 663 (3d ed. 1981). As the bankruptcy court noted, under the overall scheme of the deficiency program, the various contract requirements are in the nature of the contractual duties and promises rather than conditions precedent ...

. . . .

In any event the court notes, that, even assuming the requirements were intended as conditions precedent, the obligations of ASCS were binding from the inception of the contract.
*Matthieson*, 63 B.R. at 59–60.

The debtor relies on *In re Hill*, 19 B.R. 375, 9 B.C.D. 53 (Bankr.N.D.Tex.1982) in which the court concluded that since the actual amount of the deficiency payment was ascertainable only after the debtors filed, the monies payable to the debtor were post-petition. The *Hill* rationale, however, was explicitly rejected in *Matthieson*. In addition, *Hill* has apparently been overruled *sub silento* in subsequent Texas decisions. In *In re Parrish*, 75 B.R. 14, 16 (N.D.Tex.1987) the district court, faced with the issue of whether a CCC obligation was pre-petition, adopted the *Matthieson* rationale finding it to be "well-reasoned and persuasive" without commenting on the contrary conclusion that had been reached earlier in *Hill*. Several months later, the same court that had decided *Hill*, although a different judge, adopted the *Matthieson* rationale explaining:

The United States District Court for the Northern District of Texas faced this issue in *Parrish* and *Waldron* [*v. Farmers Home Administration*, 75 B.R. 25 (1987)], *supra*. In both instances, the proceeds of the prepetition contract were subject to offset. The *Parrish* Court found 'well-reasoned and persuasive' the decision of the Minnesota District Court in *Moratzka v. United States (In re Matthieson)*, 63 B.R. 56 (D.Minn.1986). *Matthieson* involved ASCS deficiency pay-

ments and determined that they were prepetition obligations subject to setoff because the contract in question was entered into prepetition. 'Where an obligation exists prior to bankruptcy, it is irrelevant that the exact amount of liability will not be determined until after the bankruptcy petition was filed.' *Matthieson, supra* at 59. Thus, the law in this District is well established and must be followed by this Court. Therefor, the Court does not reach the argument that the ASCS contracts are executory contracts subject to acceptance or rejection by the Debtor postpetition.

*Buske,* 75 B.R. at 216 (footnote omitted).

The debtor has asserted that the divergent holdings in *Hill* and *Matthieson* may be due to a distinction between chapter 11 and chapter 7 cases. However, any distinction between *Parrish, Matthieson,* and *Buske* which were chapter 7 cases and the outcome of this question in a chapter 11 case was dismissed by Judge Akard's dictum in *Buske:*

> *Matthieson* involved several Chapter 7 cases. This is also a Chapter 7 case. In similar matters, the Court has heard the argument that a different rule should be applied in Chapter 11 reorganizations. The *Matthieson* Court thoroughly reviewed and rejected the arguments of the prior Judge of this Court in *Hill v. Farmers Home Administration (In re Hill),* 19 B.R. 375 (Bankr.N.D.Tex.1982) wherein the very issue before the Court at this time was raised. *Hill* was a Chapter 11 proceeding in which the Court concluded that disaster payments by ASCS were postpetition monies.

*Buske,* 75 B.R. at 216 n. 5. Similarly, in *In re Pinkert,* 75 B.R. 218 (Bankr.N.D.Tex. 1987) Judge Akard again finding the *Matthieson* rationale controlling, dismissed any distinction between a chapter 11 and chapter 7 explaining:

> The Debtors correctly assert that *Matthieson* involved several Chapter 7 cases. On the other hand, the *Matthieson* Court thoroughly reviewed and rejected the arguments of the prior Judge of this Court in *Hill v. Farmers Home Administra-*

*tion (In re Hill),* 19 B.R. 375 (Bankr.N. D.Tex.1982) wherein was raised the very issue before the Court at this time. *Hill* was a Chapter 11 proceeding and the Court concluded that disaster payments by ASCS were postpetition monies. The Court in *Matthieson,* having expressly rejected those arguments, and the Court in *Parrish,* having expressly adopted the reasoning in *Matthieson,* the law in this District is well-established and must be followed by this Court.

*Id.* at 221 (footnote omitted).

Some courts have embraced the rationale that the distinction between chapter 11 and chapter 7 can be dispositive. For instance, in *In re Walat Farms,* 69 B.R. 529 (Bankr. E.D.Mich.1987), the court concluded that 1985 Price Support and Production Adjustment Program Contracts were executory contracts, to be assumed or rejected postpetition. The court explained:

> When the petition for Chapter 11 relief was filed on July 11, 1985, the debtor still owed performance of its duties in a number of substantial ways such as the duty to not plant crops in the set-aside acres, to keep cover on those acres, etc. If a farmer in the program fails to fulfill the contract's obligations during the course of a growing season, the CCC can utilize a choice of damage remedies, among them being the right to refuse to pay anything to the farmer. Of course, the defendant still owed the entirety of its obligation, that is, to pay the deficiency amount. It is plain to see, therefore, that the 1985 agreement was an executory contract. It follows then that if the contract is properly assumed by the debtor in possession, any right to a deficiency payment could only arise post-petition, and be owed to the debtor in possession *qua* trustee, and not the debtor. Consequently, mutuality would not exist and setoff would be disallowed. *In re Braniff Airways, Inc.,* 42 B.R. 443, 449, 12 C.B.C.2d 610 (Bankr.N.D.Tex.1984); *Collier, supra,* ¶ 553.08.

*Walat Farms,* 69 B.R. at 531 (footnote omitted).

The court also distinguished *Matthieson* on the ground that:

> *Matthieson* dealt with Chapter 7 cases. The case did not deal with executory contracts in a Chapter 11 setting, and therefore the opinion properly did not discuss the issue. Apparently this was because, pursuant to § 365(d)(1), the prepetition contracts were not timely assumed and so were deemed rejected. Since rejected executory contracts are themselves considered pre-petition unsecured claims, § 365(g), the necessary mutuality for use of § 553 existed; hence, the government obligations were available for set-off against the pre-petition crop loans obtained by the debtors.

*Walat Farms*, 69 B.R. at 531–32 (footnote omitted). However, in *In re Greseth*, 78 B.R. 936, 942 (D.Minn.1987) the court explicitly rejected the *Walat* analysis: .

> In the case at bar debtors argue that the facts in *Moratzka* were substantially distinct from those present here. Debtors characterize the compliance duties of the debtors in *Moratzka* as minimal in comparison to their ten-year commitment to anti-erosion procedure. As suggested by appellees, this is a distinction without a difference. Regardless of the length of the contract, the parties assumed similar obligations which were determined prepetition at the time the parties formed the contract. Debtors also argue that *Moratzka* is inapplicable because it involved chapter 7 petitions and did not deal with a reorganization. Citing *Walat Farms, Inc. v. United States*, 69 B.R. 529, 531–32 (Bankr.E.D.Mich.1987), debtors contend that the *Moratzka* contract was necessarily prepetition because it was rejected by operation of law and rejected executory contracts are deemed to be prepetition claims. The court in *Moratzka*, however, did not rely on that reasoning in finding the obligations to be prepetition. On the contrary, the court specifically held that the contract created mutual obligations that bound the parties at the time the contract was formed. *Moratzka*, 63 B.R. at 60. So too in the case at bar the parties assumed mutually enforceable obligations *prepetition.* Therefore, the CRP payments are subject to offset pursuant to 11 U.S.C. § 553(a).

Even assuming arguendo that the *Walat Farms* analysis is sound, the facts in that case differ significantly from those in this case. Unlike *Walat Farms*, when Lundell Farms filed on October 1, 1987, the deficiency payments were already ascertainable. Apparently, in connection with the Price Support Contracts there were no material obligations left to perform other than payment. Compliance reports had been timely filed and computation of the amount of payments made possible. Thus, neither the price support nor the CRP contracts were executory, at least insofar as they provided the rights to receive the payments which CCC seeks to setoff.

■ This case is not dissimilar to *In re Brooks Farms, supra*, in which every act related to setoff had been completed prior to bankruptcy except the actual transfer of funds. Although the request initiating the setoff here may be inferred from the placing of names on the debt register and the statements of CCC it is less clear than in *Brooks* that no acts other than payment were undone by CCC at the time the bankruptcy case was filed. Those things that may remain to be done by CCC in this case are not material for determining either whether the contracts are executory or whether the debts are mutual. The obligations of the debtor and CCC both arose prepetition, are mutual, and may be set off.

## ESTOPPEL

The debtor contends that its argument against setoff was weakened by its failure to file until October 1, 1987, the date the payments were ascertainable, and that the partnership would have filed before October 1, 1987, had it not been led to believe filing was unnecessary due to an agreement negotiated between Denis Bartel, counsel for Lundell Farms, and Ted Neher, a claims examiner for CCC. The alleged terms of the agreement were that CCC would remove Howard and Dennis from the debt register and give them until October 20, 1987, to propose an arrangement

which would satisfy the grain storage claim of CCC. Accordingly, the debtor delayed filing until it realized late in September that the names of Dennis and Howard had not been removed from the debt register. The debtor contends it relied on the alleged agreement and had no reason to believe CCC would not comply. It therefore argues that CCC should be estopped from asserting its claim to setoff. CCC did not address this issue in its brief.

There are several weaknesses in the debtor's estoppel argument. First, there is some doubt whether estoppel can lie against CCC. Traditionally, estoppel has not been available against the federal government or its agencies. Recently, however, estoppel has been permitted in "certain narrowly defined circumstances." *Azar v. United States Postal Service*, 777 F.2d 1265, 1269 (7th Cir.1985). In *Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982) the Seventh Circuit held estoppel could be applied against the Postal Service's Express Mail operation providing the following requirements were met:

> First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury. In addition, the Ninth Circuit noted that 'the government's action upon which estoppel is to be based, must amount to affirmative misconduct,' which that court defined as 'something more than mere negligence.'

*Portmann*, 674 F.2d at 1167, *quoting TRW, Inc. v. Federal Trade Commission*, 647 F.2d 942, 950–51 (9th Cir.1981). *See also Azar v. United States Postal Service*, 777 F.2d 1265, 1268 (9th Cir.1985).[5] Even if CCC were subject to estoppel, the debtor has failed to establish several elements of the *Portmann* test.[6] No one disputes that Mr. Neher knew the facts surrounding the negotiation and the necessary steps for removal from the debt register. But, the debtor has failed to prove any of the other elements. There was no evidence that Mr. Neher intended his actions would cause the debtor to delay its filings. In fact, there is conflicting evidence as to whether Mr. Neher actually told Mr. Bartel that Howard and Dennis would be removed from the debt register. Neither CCC nor the debtor submitted a written proposal or agreement. The only evidence is a letter from Mr. Bartel to Mr. Neher dated September 23, 1987, confirming a telephone conversation of the preceding day, which provided in relevant part:

> In view of the fact that your office is the only creditor actively pursuing the Lundells, we believe that it may be possible to work out a settlement arrangement mutually acceptable. To that end, we will be presenting a proposal to you in writing prior to October 20, 1987. I will be meeting with the Lundells in the near future with the objective of attempting to formulate a proposal that will be both deemed reasonable by your office and feasible to them.
>
> In consideration for this arrangement, and in furtherance thereof, we understand that you shall take whatever steps

---

**5.** In its brief, debtor asserts equitable estoppel requires proof of three elements: (1) action or nonaction which induces (2) reasonable reliance by another (3) to his detriment. *Bank of Sun Prairie v. Opstein*, 86 Wis.2d 669, 273 N.W. 2d 279 (1979). CCC is a federal corporation within the Department of Agriculture, therefore the test in *Portmann* pertaining to the federal government and its agencies appears to be the appropriate one in this circuit. Furthermore, even if Wisconsin criteria were applicable, a different test exists under Wisconsin law when estoppel is to be applied against the govern-

ment. *See Ryan v. Dept. of Revenue*, 68 Wis.2d 467, 470–71, 228 N.W.2d 357 (1975), *State v. City of Green Bay*, 96 Wis.2d 195, 201–03, 291 N.W. 2d 508 (1980).

**6.** There is some dispute concerning whether affirmative misconduct must be shown. Although no such misconduct has been asserted here, we need not consider this element because the debtor has failed to prove the other elements of the *Portmann* test.

are necessary to see that the Lundells are not put on the debt register at the Grant and Jefferson Counties' ASCS offices, or if they have already been placed on such registers, to have them promptly removed, such that their entitlement to government programs is not jeopardized. This status is to remain in effect until at least October 20, 1987, and possibly thereafter if it would appear that we are making substantial progress toward a mutually agreeable resolution.

I would request that you contact directly the ASCS offices in Grant County and Jefferson County, Wisconsin such that they are aware of this arrangement, and that you confirm same with copies to the undersigned.

(Debtor's exhibit # 2). CCC, on the other hand, submitted Mr. Neher's telephone record resume dated September 25, 1987, which provides in part:

I told Mr. Bartel that I would need to have a conference with other people at our office before I could agree to the removal from the debt register but that he should go ahead and start on the proposal.

(U.S. exhibit # 18). This resume is consistent with Mr. Neher's testimony that he lacked authority to remove Dennis and Howard from the debt register.

■ The equivocal nature of the evidence makes it impossible to conclude that any final agreement was reached or that Mr. Neher ever agreed that Dennis and Howard would be removed from the debt register. The evidence indicates that the matter was the subject of negotiation. There is no basis to conclude that Mr. Neher intended his actions to be relied on in delaying the filing. Without a much more

concrete and final agreement any reliance by the debtor would have been unreasonable.

## MARITAL PROPERTY

■ The debtor's third argument is more difficult. It can be summarized as follows: CCC owes Howard and Dennis payments under the contracts; the payments are income under WIS.STAT. § 766.31(4) as defined in WIS.STAT. § 766.01(10); Elna and Debra as wives have a present undivided interest in payments to their husbands. *See* WIS.STAT. § 766.31(3); and since CCC has conceded it is making no claim against Elna nor Debra, their right to payments is not part of a mutual obligation, and their claimed interest equal to one half of the proceeds cannot be set off.

Without wandering too far into the labyrinth of Wisconsin's marital property act it is apparent that the debtor's argument is flawed. The summary in *In re Dreske*, 25 B.R. 268, 270, 7 C.B.C.2d 1239 (Bankr.E.D. Wis.1982) points to the main conceptual problem in this case:

What both parties have overlooked is the primary rule in bankruptcy cases, in considering a problem involving partners or partnerships, that a partnership is a distinct legal entity separate and apart from the partners who formed it.

It follows that for bankruptcy purposes, partnership property is distinguished from the individual property of the partners. *Turner v. Central National Bank of Mattoon, Illinois*, 468 F.2d 590 (7th Cir.1972).[7]

The contracts at issue are listed as partnership assets, not the individual assets of the partners. Although both parties have argued that Howard and Dennis are owed the payments under the contract the implicit assumption of the turnover motion is

---

7. Conceptually, another problem arises since even though CCC concedes it is making no claim against them individually, Elna and Debra were partners when the grain storage agreement was entered between Lundell Farms and CCC, and when the loss occurred. Arguably their right to receive any portion of the proceeds would not bar setoff. WIS.STAT. § 178.12 provides:

*Liability of Partners.* All partners are liable:
(a) Jointly and severally for everything

chargeable to the partnership under ss. 178.10 and 178.11; (b) jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract.

The release of Elna and Debra does not change the fact that CCC's claim is against the partnership. CCC claimed Howard and Dennis individually liable since presumably it was unaware Elna and Debra were partners.

that these contracts were entered into on behalf of the partnership. In fact, the debtor's turnover motion concedes as much stating "said payments became due by virtue of certain contracts and agreements entered into between the debtor and its partners and the ASCS." Presumably, these contracts were entered into by the agent-partners on behalf of Lundell Farms.[8] *See* WIS.STAT. § 178.06. These contracts are scheduled as partnership assets and any contrary conclusion would render the debtor's turnover motion meaningless and frivolous.[9]

Under Wisconsin partnership law, with respect to any specific partnership asset, no partner has any individual interest; each partner is co-owner with his or her partners. WIS.STAT. § 178.21(2). The interests of partners in "specific property" is defined in section 178.21(2) as a tenant in partnership. The incidents of this tenancy are such that without the consent of the other partners, a partner has no right to possess the property for any purpose other than those of the partnership. *See* section 178.21(3)(a). A partner has no individual right to assignment. *See* section 178.21(3)(b). A partner's right is not subject to attachment or execution, except on a claim against the partnership. *See* section 178.21(3)(c). The payments in this case belong to the partnership not to any individual partner. In the absence of evidence of contrary terms of a partnership agreement, there is no basis for concluding the contrary. Therefore, any application of marital property principles to these facts is inappropriate.

Some novel concerns are raised in this case because the individuals are both business partners and husband and wife. Important differences between the capacities have been summarized as follows:

marriage is not a partnership in the technical legal sense under Chapter 178 or the Internal Revenue Code because marital property interests are present undivided one-half interests without regard to the actual monetary value of a contribution made by a spouse and without regard to intent to make a profit. Moreover, a partner may convey his or her interest in a partnership to a third party, while a spouse cannot convey his or her interest in marital property as a separate interest. The marital relationship is not a legal entity; an economic partnership is.

K. Christiansen, F. Wm. Haberman, J. Haydon, D. Kinnamon, M. McGarity, M. Wilcox, *Marital Property Law in Wisconsin* (2nd ed. 1986) p. 2–25.

For bankruptcy purposes, the debtor, Lundell Farms, must be treated as a legal business entity. The individual partners are designated payees of the disputed proceeds only in their capacity as agents for Lundell Farms, not as "marital partners." As interesting as it might be to attempt to unscramble the tangled conceptual threads of the Wisconsin marital property act as it applies to spouses/partners receiving income in their individual capacities, there is no need to do so in deciding this matter.

## RELIEF FROM STAY

The final issue is whether relief from stay is appropriate in this case. Prelimi-

---

**8.** Each contract has an appendix attached which provides:

PARTICIPATION BY PARTNERSHIP

If the participant is a partnership, no payment shall be made to the partnership until the social security numbers and/or employer identification numbers of all members of the partnership are furnished to CCC, together with a listing of the beneficial interest which each member has in the partnership.

There is no way to determine whether the partnership complied with this provision.

**9.** As stated above, the contracts in this case were scheduled as partnership assets and are disputed in the bankruptcy of the partnership. In the absence of contrary evidence, I must consider the proceeds of the contracts to be property of the partnership. Furthermore, if the proceeds were the individual property of Howard and Dennis, they would not be property of this bankruptcy estate or subject to the scope of the section 362 stay in this case and CCC could proceed directly with setoff pursuant to CFR § 13.1 (1986). *See In re K & L Ltd,* 741 F.2d 1023, 1029 (7th Cir.1984) *citing In re Friendship Medical Center, Ltd.,* 710 F.2d 1297, 1302 (7th Cir.1983). (Bankruptcy court only has jurisdiction over property owned by or in the actual or constructive possession of debtor.)

narily, we note that this issue was not addressed by CCC in its brief. In addition, no actual motion for relief from stay was filed in accordance with Bankruptcy Rules 4001 and 9014. CCC failed to articulate any specific grounds for relief in accordance with Bankruptcy Rule 9013. However, CCC did request relief from stay in its response to debtor's turnover motion. The turnover hearing was noticed and both parties proceeded to argue their respective positions on relief from the stay. Therefore, the technical procedural inadequacies in this case are not fatal to CCC's argument, although they are relied upon to void any potential claim to relief having been previously granted by virtue of court inaction under 11 U.S.C. § 362(e).

■ I conclude that relief from the stay is merited in this instance. Section 362(d) sets forth two alternative grounds for relief from stay:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest or;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Early in a reorganization case it is more difficult to show that the debtor has no equity in the property *and* that the property is not needed for an effective reorganization. For instance, in this case the debtor has persuasively argued that the farm program payments are essential to planting a 1988 crop and thus to the debtor's reorganization. If CCC had relied solely on this ground for relief its request would be denied.

The alternative ground for relief found in section 362(d) "for cause, including lack of adequate protection" is supported by the facts developed on this motion. Adequate protection in one setoff context has been explained as follows:

For setoffs, adequate protection means that if, for example, a bank is to be precluded from setting off the money in the debtor's bank account against the amounts the debtor owes the bank, steps must be taken to assure the bank that it will be paid an amount at least equal to that in the account. If the debtor is to be permitted to use the money in the account, that protection will have to come from other sources, such as periodic payments to the bank to reduce its debt as the money in the account goes down (which is not likely to be practical) or by giving the bank a lien on other property. The money in the bank account should be treated as "cash collateral," meaning that the debtor or trustee cannot use it after the petition without the prior permission of either the creditor bank or the bankruptcy court.

Robert E. Ginsberg, *Bankruptcy* at ¶ 8303 (1986). The debtor has offered CCC a lien on future crops as the sole source of adequate protection for the use of cash to be received in payment on the contracts. The sufficiency of this offer is crucial, but unfortunately neither party has provided any probative evidence or meaningful analysis of this issue. The burden of proving adequate protection is on the debtor in possession. 11 U.S.C. § 362(g).

In most cases, a bare replacement lien on future, non-existent crops is too speculative to constitute adequate protection. A majority of courts which have examined this question agree. *See In re Stacy Farms*, 78 B.R. 494, 16 B.C.D. 568 (Bankr.S.D.Ohio 1987); *In re Serbus*, 48 B.R. 5 (Bankr.D. Minn.1984); *First Bank of Miller, Miller S.D. v. Wieseler*, 45 B.R. 871 (D.S.D.1985). *But see In re Martin*, 761 F.2d 472 (8th Cir.1985); *In re DeBoer*, 63 B.R. 26 (Bankr. D.Neb.1986). *See also In re Westcamp*, 78 B.R. 834 (Bankr.S.D.Ohio 1987); *In re Berens*, 41 B.R. 524 (Bankr.D.Minn.1984). Debtor's offer of a lien on future non-existent crops is insufficient to constitute adequate protection of CCC's current inter-

est in cash on hand. Therefore, relief from stay must be granted and CCC may proceed to setoff the unpaid amounts due on the subject contracts which it now holds. The debtor's motion for turnover must be denied.

The foregoing constitutes my findings of fact and conclusions of law in this matter.

CCC may prepare a judgment consistent with this memorandum decision and the accompanying order.