**In re James A. ALLEN, Debtor.**

**Bankruptcy No. L–90–01473C.
Contested No. 1178.**

United States Bankruptcy Court,
N.D. Iowa.

Jan. 15, 1992.

Joseph A. Peiffer, Eells & Peiffer, P.C., Cedar Rapids, Iowa, for debtor.

Kristin Tolvstad, Asst. U.S. Atty., U.S. Atty.'s Office, Cedar Rapids, Iowa, for Commodity Credit Corp.

### RULING RE: USA'S MOTION FOR RELIEF FROM AUTOMATIC STAY IN ORDER TO PERFECT § 553 SETOFF

MICHAEL J. MELLOY, Chief Judge.

This matter is before the Court on the motion of the Agricultural Stabilization and Conservation Service for the Commodity Credit Corporation (collectively referred to as "CCC") seeking relief from the automatic stay in order to perfect a setoff. CCC seeks to setoff a debt CCC owes to the debtor, James Allen ("debtor") against CCC's claim against the debtor. The debtor opposes the motion for relief from stay by asserting that CCC does not have a valid setoff right to exercise in this case. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) & (O). The following opinion granting CCC's motion for relief

from stay in order to exercise a § 553 setoff constitutes this Court's findings of fact, conclusions of law, and order pursuant to Fed.R.Bankr.P. 7052.

### Findings of Fact

The parties have submitted this matter to the Court on briefs and stipulated facts and exhibits. The following findings of fact are taken from this Court's review of the stipulated facts and exhibits:

1. On December 18, 1985, debtor executed a CCC Farm Storage Note and Security Agreement (Exhibit A) pledging 16,000 bushels of 1985 corn as collateral for a $40,160.00 price support loan.

2. On January 10, 1986, the debtor executed a subsequent CCC Farm Storage Note and Security Agreement (Exhibit B) pledging an additional 8,200 bushels of 1985 corn as collateral for an additional $20,582.00 price support loan disbursement.

3. On October 25, 1986, the debtor executed a CCC Farm Storage Grain Reserve Agreement (Exhibit D) placing 21,706.03 bushels of the 1985 corn which was subject to the loans identified as Exhibits A and B into the 1985 Grain Reserve. This transfer left an outstanding balance of $54,482.14 on the price support loans which the debtor still owed to CCC (Exhibits C & D).

4. On January 21, 1986, the debtor executed a CCC Farm Storage Note and Security Agreement (Exhibit E) pledging 8,612 bushels of 1985 corn as collateral for a $21,688.38 CCC price support loan.

5. On October 25, 1986, the debtor executed a CCC Farm Storage Grain Reserve Agreement (Exhibit F) placing 1,937.01 bushels of the 1985 corn subject to the loans identified in Exhibit E into the 1985 Grain Reserve. This transfer left the debtor owing CCC $4,907.06 on the price support loans identified in Exhibit E.

6. On June 10, 1987, the CCC approved a Conservation Reserve Program ("CRP") Contract entered into by the debtor and other individuals (Exhibit G). According to this contract, 280.2 acres of ground were placed into the CRP for a 10 year period at an annual rental rate of $84.00 per acre, for a total annual payment of $23,537.00.

The debtor has the right to receive 21.41% of this payment or $5,039.00 annually.

7. On May 5, 1988, the CRP contract was revised, and the parties voided the old contract. However, the new contract (Exhibit H) did not change the basic payment terms.

8. The new CRP contract contained the following relevant terms:

a. The participants shall place into the CRP for a period of 10 crop years from the date this Contract is executed by CCC the acreage of eligible cropland specified [in this Contract], implement the conservation plan developed for such land, and any of the terms and conditions of this Contract. (Provision 3A).

b. The participants shall maintain the vegetative cover and the required conservation practices on the land which is subject to this Contract and take other actions that may be required by CCC to achieve the reduction in erosion necessary to maintain the production capability of the soil throughout the contract period. (Provision 3D)

c. The participant shall reduce [his or her] aggregate total of crop average bases.... (Provision 3E)

d. The participant shall not knowingly or willingly allow grazing, harvesting, or other commercial use of the forage from the land subject to this Contract, except as may be specifically permitted by CCC in response to a drought or similar emergency. (Provision 3F)

e. The participant shall not harvest or sell, nor otherwise make commercial use of trees on the land subject to this Contract.... (Provision 3G).

f. The participant shall not produce any agricultural commodity on converted wetland or on highly erodible land.... (Provision 3H)

g. The participant shall comply with the noxious weed laws of the applicable state on land which is subject to this Contract. (Provision 3J)

h. The participant shall file timely [all appropriate reporting materials]. (Provision 3L)

i. CCC agrees to:

(1) Pay to the participants an annual rental payment for a period of years not in excess of the contract period . . .;

(2) Share the cost with participants of establishing eligible conservation practices specified in the conservation plan at the levels and rates of cost-sharing determined in accordance with paragraph 5 of this appendix; and

(3) Provide technical assistance necessary to assist the participant in carrying out this Contract. (Provision 3M)

j. [T]he following regulations found in Title VII of the CFR are also incorporated by reference as part of this Contract:

A Part 13, setoffs and withholding. . . . (Provision 13A)

k. Setoffs and withholdings for debts owed to agencies of the U.S. Government shall be made in accordance with the provisions of 7 CFR Part 13. (Provision 17A).

l. Termination of Contract

(1) If the participant fails to carry out the terms and conditions of this Contract, CCC may, after considering the recommendations of the CD and SCS, terminate this Contract.

(2) If this Contract is terminated by CCC in accordance with this paragraph 23A, the participant shall:

(i) Forfeit all rights to further payments under this Contract and refund all payments received together with interest thereon, as determined by CCC, or

(ii) Forfeit all rights to payments under this Contract and pay liquidated damages to CCC at the rate of 25 percent of the annual rental payment specified in item 6 of Form CRP-1 multiplied by the eligible acreage which was offered to be placed in the CRP if no payments have been received by the participant under this Contract.

(3) The purpose of the CRP is to control erosion on highly erodible lands thereby protecting the Nation's soil and water resources for succeeding genera-

tions. Once this Contract has been entered into between CCC and the participant, CCC and other segments of the agricultural community will act based on the assumption that this Contract will be fulfilled and reduction in erosion and production will be obtained. CCC's action includes budgeting and planning for the CRP in subsequent crop years. A participant's failure to carry out the terms and conditions of this Contract undermines the basis for these actions, damages the credibility of CCC's programs with other segments of the agricultural community, and requires additional expenditures in subsequent crop years in order for the required levels of acreage to be placed in the CRP and in order for an adequate reduction in erosion to be obtained. While the adverse effects on CCC of the participant's failure to comply with the terms and conditions of this Contract are apparent, it would be impossible to compute the actual damage suffered by CCC.

Therefore, upon the termination of this Contract in accordance with this paragraph 23A, participant's to such contract shall be required to refund all payments received, together with interest, or to pay liquidated damages in an amount specified in paragraph 23A(2)(ii) if no payments have been made. (Provision 23A)

m. If the participants fail to carry out the terms and conditions of this Contract but CCC determines that such failure does not warrant termination of this Contract, CCC may require such participants to refund payments received under this Contract or to accept such adjustments in the payments as are determined to be appropriate by CCC. (Provision 23C)

n. This Contract is effective when signed by the owner of the land to be placed in the CRP, . . . and an authorized representative of CCC. (Provision 28A).

9. On August 22, 1990, the debtor filed a voluntary Chapter 12 Bankruptcy Petition.

10. The Court confirmed the debtor's Chapter 12 plan, as amended, on March 28, 1991.

11. Paragraph 10.1 of the debtor's confirmed plan states in relevant part: "Debtor specifically assumes his contract with United States of America acting through the ASCS with respect to CRP on land owned by him in Jones County, Iowa."

12. On the date of filing, the debtor still owed CCC $54,482.14 from shortfalls in corn he had placed in storage. There has been no allegation that the debtor's debt to CCC arising from the shortfall in corn was the result of fraud.

13. CCC wants to setoff its claim to the $54,482.14 in this bankruptcy proceeding against the yearly rental payments CCC owes to the debtor.

### Conclusions of Law

■ CCC contends that it has a right to relief from the automatic stay in order to perfect its right to setoff pursuant to 11 U.S.C. § 553.[1] Section 553 states, in relevant part:

Except as otherwise provided in this section and in [section] 362 ... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of a case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

§ 553(a). To establish a right to setoff the creditor must demonstrate the following:

1. A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case.
2. The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case.
3. The debt and the claim are mutual obligations.

*Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir.1987) (quoting *In re Nickerson & Nickerson, Inc.*, 62 B.R. 83, 85 (Bankr.D.Neb.1986); *see also In re Lundell Farms*, 86 B.R. 582, 584 (Bankr.W.D.Wisc.1988) (listing the

same necessary elements). In short, "[t]he only requirements are that the debts and claims be mutual and pre-petition." *Braniff*, 814 F.2d at 1035.

CCC contends that all of the statutory elements needed for setoff are satisfied here. The debtor concedes that the CCC has a valid, prepetition claim against him for $54,482.134. Hence, that portion of the setoff test (element 2 from the *Braniff* case) is satisfied and is not a matter of dispute here. The debtor, however, makes a number of arguments in support of his contention that the other 2 elements of the setoff test (mutuality and creditors prepetition debt to debtor) are not satisfied.

The debtor predicates a number of his arguments against allowing CCC to proceed with its setoff upon the fact that he has assumed the CRP contract as an executory contract under his confirmed reorganization plan. The debtor believes that by assuming the contract post-petition, he defeats both the requisite prepetition character of the debt which CCC owes him under the contract as well as the requisite mutuality of obligations.

In making these arguments, the debtor relies on a line of authority first developed in *Walat Farms, Inc. v. United States of America (In re Walat Farms)*, 69 B.R. 529 (Bankr.E.D.Mich.1987). The *Walat Farms* court first found that a CRP Contract is an executory contract which the debtor-in-possession can assume postpetition. *Id.* at 531. Upon assumption by the debtor-in-possession, the *Walat Farms* court found that "any right to a deficiency payment could only *arise postpetition,* and be owed to the debtor in possession ... and not the debtor." *Id.* (emphasis added). Hence, the *Walat Farms* court concluded that the requisite mutuality under § 553 would not exist because the debtor and debtor-in-possession are different entities. *Id. Walat Farms* also indicates that the assumption makes the obligation of CCC *"arise postpetition,"* in contravention of the prepetition debt requirement of § 553(a).

1. All statutory references are to Title 11, United States Code, unless otherwise indicated.

A number of courts explicitly have adopted the *Walat Farms* rationale. *See, e.g., Small Business Admin. v. Gore (In re Gore),* 124 B.R. 75, 77–78 (Bankr. E.D.Ark.1990); *In re Evatt,* 112 B.R. 405, 411–14 (Bankr.W.D.Okla.1989) *aff'd* 112 B.R. 417 (W.D.Okla.1990).[2] All of these cases have noted that the assumption of the CRP contracts as executory contracts makes them postpetition contracts of the debtor where the debt is not absolutely owed prepetition. *Gore,* 124 B.R. at 78; *Evatt,* 112 B.R. at 419. Hence, *Walat Farms* and all of the cases adopting its rationale have found that assuming a CRP contract postpetition as an executory contract destroys both mutuality and the prepetition nature of the contract. The debtor urges the Court to adopt this rationale here and refuse to allow CCC to setoff.

CCC, on the other hand, argues that the Court should not follow the *Walat Farms* line of authority. CCC argues that the Court instead should allow the setoff by following a line of cases which rejects *Walat Farms.* The line of cases CCC relies on originated in two cases from the District of Minnesota: *Moratzka v. United States of America; Agricultural Stabilization and Conservation Service (In re Matthieson),* 63 B.R. 56 (D.Minn.1986) and *Greseth v. Federal Land Bank of St. Paul (In re Greseth),* 78 B.R. 936 (D.Minn.1987). In *Matthieson* and *Greseth* the District of Minnesota found that CCC's obligation to pay debtors was subject to setoff against CCC's claim against the debtor because CCC's obligation to pay arose prepetition and the obligation was mutual at that time. *Matthieson,* 63 B.R. at 60; *Greseth,* 78 B.R. at 942. *Matthieson,* which *Greseth* relied on, reasoned that the debts arose prepetition because the "contract requirements [were] in the nature of contractual duties and promises rather than conditions precedent." 63 B.R. at 59. Hence, *Matthieson* concluded that the obligation of CCC to pay the debtor arose prepetition, was mutual with the debtor, and, therefore, that CCC could exercise a setoff. *Id.* at

59–60. The *Greseth* court reaffirmed the *Matthieson* rationale in the context of a Chapter 12 reorganization case. *Greseth,* 78 B.R. at 942. A number of other courts specifically have adopted the *Matthieson* and *Greseth* rationale in similar cases. *In re Affiliated Food Stores, Inc.,* 123 B.R. 747, 748–49 (Bankr.N.D.Tex.1991); *In re Lundell Farms,* 86 B.R. 582, 586–88 (Bankr.W.D.Wis.1988); *Buske v. Mc-Donald v. United States (In re Buske),* 75 B.R. 213, 215–16 (Bankr.N.D.Tex.1987); *United States, Farmers Home Admin. v. Parrish (In re Parrish),* 75 B.R. 14, 16 (N.D.Tex.1987); *see also Pinkert v. FmHA (In re Pinkert),* 75 B.R. 218, 220–21 (Bankr.N.D.Tex.1987).

Most of the cases following the *Matthieson* rationale specifically have declined to follow, or found less persuasive, the *Walat Farms* rationale. *See, e.g., Affiliated Food Stores,* 123 B.R. at 748 n. (declining to follow (*Walat Farms*); *Lundell Farms,* 86 B.R. at 586–88; (finding *Matthieson* more persuasive); *Greseth,* 78 B.R. at 942 (following *Matthieson* instead of *Walat Farms*). Conversely, the *Walat Farms* court and those following its rationale either have declined to follow *Matthieson* or attempted to distinguish its holding. *See, e.g., Evatt,* 112 B.R. at 420 n. 5 (district court agrees with bankruptcy court's determination that *Matthieson* case distinguishable); *Evatt,* 112 B.R. at 411 (bankruptcy court distinguishes *Matthieson*); *Walat Farms,* 69 B.R. at 531–32 (distinguishing and limiting *Matthieson*). The main reason that *Walat Farms* and other courts have given for distinguishing *Matthieson* is that *Matthieson* did not discuss the executory contract rationale provided in *Walat Farms.* The *Walat Farms* court, and others following its authority, observed that:

> *Matthieson* dealt with Chapter 7 cases. The case did not deal with executory contracts in a Chapter 11 setting, and therefore the opinion properly did not discuss the issue. Apparently this was because, pursuant to § 365(d)(1), the pre-

---

**2.** Another case, *In re Fryar,* 93 B.R. 101, 103–04 (Bankr.W.D.Tex.1988), also found the *Walat Farms* reasoning controlling, but was vacated by a subsequent order at 113 B.R. 317, 318 (W.D.Tex.1989).

petition contracts were not timely assumed and so were deemed rejected. Since rejected executory contracts are themselves considered pre-petition unsecured claims, § 365(g), the necessary mutuality for use of § 553 existed; hence, the government obligations were available for set-off against the pre-petition crop loans obtained by the debtors.

*Walat Farms*, 69 B.R. at 532 (footnote omitted).

The *Greseth* court, however, a Chapter 12 reorganization case, dismissed the assumptions made by *Walat Farms* in trying to distinguish *Matthieson*. The *Greseth* court observed that *Matthieson* did not rely on that reasoning in reaching its result and:

> [o]n the contrary, the [*Matthieson*] court specifically held that the contract created mutual obligations that bound the parties at the time the contract was formed.

*Greseth*, 78 B.R. at 942. *Greseth* concluded that the *Walat Farms* rationale would not change the fact that the obligations were mutual and binding prepetition obligations. *Id.; see also Lundell Farms*, 86 B.R. at 587 (noting persuasive reasoning of *Greseth* in rejecting the *Walat Farms* rationale). Hence, *Greseth* approved *Matthieson* for reorganization cases.

Based on the foregoing arguments and discussion, this Court believes the parties have presented this Court with a choice between two distinct and irreconcilable lines of authority for resolving the present dispute. The only relevant consideration that does not appear to be in dispute is that the CRP contract qualifies as an executory contract. The crux of the dispute, therefore, lies in the effect of the debtor's assumption of the executory contract on CCC's setoff rights under § 553.

The debtor contends that the *Walat Farms* line of authority supports his contention that assuming the CRP contract under § 365 makes it a postpetition contract and that CCC's obligation to pay arises postpetition, to the debtor-in-possession. Specifically, the debtor contends that the debtor and debtor-in-possession are different entities. Based on that distinction,

the debtor concludes that assuming the CRP contract destroys both the requisite mutuality of parties and prepetition debt for the purposes of § 553.

CCC, on the other hand, essentially argues that the debtor's act of assuming the executory contract should have no effect on the analysis here. CCC contends that *Matthieson*, *Greseth*, and related cases have found that CRP contracts (like the one here) are based on mutual promises, are binding on the date the contract is entered, and give rise to a prepetition debt between CCC and the debtor which is mutual with CCC's claim against the debtor. CCC believes the debtor simply has assumed an executory CRP contract which gives rise to a prepetition debt which satisfies the mutuality requirement.

CCC further points out that in order to avoid reaching such a conclusion, the Court would need to find that the contract is subject to conditions precedent which the debtor must perform postpetition in order even to cause CCC's obligation to the debtor to arise. CCC urges the Court to follow the *Matthieson* line of cases and reject that argument. The debtor, however, has asserted that the Court should characterize the executory CRP Contract as a contract subject to condition precedents. The debtor believes that *Matthieson* and related cases improperly failed to characterize the CRP contracts in this manner.

The Court also notes the debtor argues that even if the Court finds that all of the statutory elements for setoff under § 553 are satisfied, the Court should deny CCC's setoff request on equitable grounds. The debtor points out that the § 553 setoff is not mandatory, but instead falls within the equitable discretion of the Court. Here, the debtor asks the Court to refuse CCC's setoff request because it will substantially hinder the debtor's ability to reorganize.

In order to determine the effect of the debtor's assumption of the CRP contract on the § 553 requirements for setoff, the issues on each of the § 553 requirements must be analyzed. The Court must determine the time at which CCC's debt to the debtor arises and whether the assumption

destroys mutuality of parties. Then, if those statutorily required elements for setoff under § 553 are satisfied, the Court must decide whether to exercise its equitable discretion and refuse to allow the setoff.

### I. *The Effect of Debtor's Assumption of the Executory Contract On the Time at Which CCC's Obligation to Pay the Debtor Arises.*

One of the elements CCC must establish to demonstrate its right to a § 553 setoff is that the debt it owes to the debtor "arose" prepetition. § 553(a). The Fifth Circuit has noted that to arise prepetition, the debt must be "absolutely owed" at a prepetition time.[3] *Braniff,* 814 F.2d at 1036. Hence, the key inquiry in determining when CCC's debt to debtor arose, is the time at which the CCC "absolutely owed" the debt to the debtor.

The debtor has raised essentially two arguments in support of his position that the debt arose after he filed for bankruptcy. First, the debtor, and the cases he relies on, contend that assuming an executory contract makes it a postpetition contract of the bankruptcy estate under which the obligations necessarily arise postpetition. Second, the debtor contends that because the contract is executory, by its very nature it requires the debtor to perform conditions precedent which must be satisfied before CCC's debt to pay debtor even arises. The debtor believes that after assuming the contract conditions precedent remain which can only be satisfied postpetition, delaying the time CCC's obligations arise to a postpetition time.

CCC argues that the simple assumption of an executory contract cannot modify the date at which the obligations of CCC arose. CCC then asserts that the contract cannot be construed as conditional, but instead should be construed as a contract for mutual promises that arose and became binding

prepetition. The Court will address each of these arguments separately.

### a. Does Assumption Convert the CRP Contract to a Postpetition Contract Where CCC's Debt to Debtor Arises Postpetition.

The debtor points out that a number of cases have found that by assuming a CRP contract, "the contract becomes a postpetition contract of the estate." *Fryar,* 93 B.R. at 104 (citing *In re Ridgewood Sacramento, Inc.,* 20 B.R. 443 (Bankr.E.D.Cal.1982)); *see also Gore,* 124 B.R. at 78 ("assumed CRP contract becomes a postpetition contract under which the debtors-in-possession are obligated to perform"). One court also found "that ASCS/CCC is obligated to make payment only upon the debtor-in-possession's assumption" of the executory CRP contract. *Evatt,* 112 B.R. 417 (district court affirming bankruptcy court decision). Hence, these cases suggest that CCC's obligation to the debtor is operative only if the debtor assumes the CRP contract which by its nature, makes the contract a postpetition obligation.

The Court first must point out that the *Fryar* decision the debtor relies on has been vacated by the District Court for the Western District of Texas in *In re Fryar,* 113 B.R. 317, 318 (W.D.Tex.1989). To the extent the other cited cases suggest such a result, this Court declines to follow them. This Court does not believe that any portion of § 365 allows for this result. To find that assuming the contract changes the effective date obligations arise under the contract to a postpetition time essentially would allow the debtor to modify the contract. Under the CRP contract, there is a provision stating that the effective date for the contract is the prepetition date that it was signed. Nothing in § 365 states or even suggests that the assumption of a contract allows the debtor to escape or modify terms which do not work to its

---

3. Most courts do not require the entire amount of the debt to be due, nor do they require that the amount owed be definitely ascertainable. *See, e.g., Braniff,* 814 F.2d at 1036 (and case cited therein); *Express Freight Lines, Inc. v. Kel-ly (In re Express Freight Lines Inc.),* 130 B.R. 288, 292–93 (Bankr.E.D.Wisc.1991) (and cases cited therein); *see also* 4 *Collier on Bankruptcy* § 553.10 at 553–51, 52 (15th Ed.1991).

benefit. Neither the word "assume" nor any other phrase in § 365 suggest that assuming a contract allows the debtor to do anything other than carry on with the contract according to its terms, including provisions defining the effective date.

A plethora of authoritative case law supports this reading of § 365. The U.S. Supreme Court and the Eighth Circuit Court of Appeals both have observed that when the debtor assumes a contract the debtor assumes that contract *cum onere*—with all of its benefits and burdens. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984); *In re Steelship Corp.*, 576 F.2d 128 (8th Cir. 1978). Likewise, the Ninth Circuit Court of Appeals has observed that "[i]f and when assumed, the contract operates according to its tenor." *Public Service Co. of New Hampshire v. New Hampshire Elec. Coop., Inc. (In re Public Service Co. of New Hampshire)*, 884 F.2d 11, 14 (1st Cir. 1989). Here, the CRP contract states that the obligations under the contract become effective on the prepetition date at which the parties signed the contract. The benefit of continuing to receive payments under the contract which the debtor assumed is accompanied by the burdens under the contract, including the effective date of the obligations, and other limiting factors. Hence, the mere assumption of the contract does not make the contract a postpetition contract under which the debt of CCC to the debtor must arise postpetition.

b. *When CCC's Obligation to Pay Arise Under the Contract.*

As noted above, the contract provides that the obligations of the parties become effective on the date the parties signed it. The debtor argues, however, that CCC's obligation to pay him still arises postpetition because CCC's obligation to pay him is subject to conditions precedent. The debtor and the cases supporting his position reason that the CRP contract is executory and by its very nature provides that the parties each have remaining obligations to satisfy. The debtor contends his obligations are conditions precedent to CCC's obligation to pay him.

The court in *Gore* effectively summarized this argument when it observed:

> The Government's obligation to make the annual postpetition payments under the assumed contract will accrue only as the obligations of the debtors-in-possession are performed postpetition. If the debtors-in-possession fail to perform, the Government can terminate the contract. Therefore, the Government's debt to the Gores are not absolutely owed prepetition and the postpetition CRP payments cannot be offset against the Gores' prepetition debt to the SBA. *See Evatt*, 112 B.R. at 411–12; *Walat Farms*, 69 B.R. at 531.

124 B.R. at 78; *see also Evatt*, 112 B.R. at 419.

CCC argues that the Court should follow the *Matthieson* rationale and find that the contract was for mutual promises, and that the CCC's debt to the debtor arose at the prepetition date when the contract became binding and effective. 63 B.R. at 59–60; *Lundell Farms*, 86 B.R. at 586–88. CCC asserts that the terms of the contract clearly demonstrate that it was for mutual, binding promises under which the mutual obligations arise prepetition and satisfy the tests for setoff under § 553(a).

■ These arguments present a question of contract interpretation. For matters of contractual interpretation, this Court looks to Iowa law. The law in Iowa recognizes the difference in the effect of a contract for mutual binding promises and a contract subject to conditions precedent. Iowa law recognizes that the presence of "conditions precedent in a contract ... delays the enforceability of the contract until the condition precedent has taken place." *H.L. Munn Lumber Co. v. City of Ames*, 176 N.W.2d 813, 816 (Iowa 1970). The Iowa Supreme Court has observed that:

> Conditions precedent are ... those facts and events, occurring subsequent to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.

*Khabbaz v. Swartz*, 319 N.W.2d 279, 283 (Iowa 1982) (quoting *Mosebach v. Blythe*, 282 N.W.2d 755, 759 (Iowa App.1979) (which quotes 3A *Corbin on Contracts*, § 628 at 16 (1960)). "Nonperformance of a condition precedent vitiates a contract or proposed contract." *Khabbaz*, 319 N.W.2d at 284. A contract containing no conditions is based upon mutual promises and is binding and enforceable at the time the parties entered the contract. *Decker v. Juzwik*, 255 Iowa 358, 121 N.W.2d 652, 662 (1963). The remedy for failure of a party to perform any of its binding and enforceable obligations is breach of contract. *Union Story Trust & Savings Bank v. Sayer*, 332 N.W.2d 316, 321 (Iowa 1983). Hence, a contract based on conditions precedent does not give rise to obligations under the contract until the conditions are satisfied whereas a contract based on binding, mutual promises gives rise to the obligations at the time the parties make the agreement.

In analyzing whether contractual relationships are subject to conditions precedent, Iowa courts often have looked to the *Restatement of Contracts* (and the *Restatement (Second) of Contracts* (1979)) and 3A *Corbin on Contracts* (1960). *See, e.g., Khabbaz*, 319 N.W.2d at 283 (citing *Corbin*); *Mosebach*, 282 N.W.2d at 759 (quoting *Corbin*); *National Farmers Organization, Inc. v. Lias*, 271 N.W.2d 751, 754 (Iowa 1978) (citing *Corbin*); *H.L. Munn Lumber Co.*, 176 N.W.2d at 816 (citing *Restatement*); *Decker v. Juzwik*, 121 N.W.2d at 662 (citing *Restatement*).

 Under Iowa law, "[a] determination that a condition precedent exists depends not on the particular form of words used; but upon the intention of the parties gathered from the language of the entire instrument." *Khabbaz*, 319 N.W.2d at 283

(quoting *David & Co. v. Cobban*, 39 Iowa 392, 393 (1874)); *Mosebach*, 282 N.W.2d at 759 (citing same language). In attempting to determine whether the parties intended to make the contract conditional, all of the traditional maxims and principles of interpretation apply. *See Restatement Second of Contracts § 226 cmt. a* (1979) (hereinafter *Restatement 2d.*). Both the *Restatement 2d.* and 3A *Corbin on Contracts* (hereinafter *Corbin*), however, have provided some additional guidance for determining whether the parties intended to create a conditional contract. The *Restatement 2d.* points out that the contract in question should be construed with a preference for finding a contract based on binding promises, rather than conditions. *Restatement 2d of Contracts § 227(2) and cmt.d.*[4] *Corbin* provides:

The first step, therefore, in interpreting an expression in a contract, with respect to condition as opposed to promise, is to ask oneself the question: Was this expression intended to be an *assurance* by one party to the other that some performance by the first would be rendered in the future and that the other *could rely upon* it? If the answer is yes, we have found the expression to be a promise that the specified performance will take place. The alternative question to be asked is: Was this expression intended to make the duty of one party conditional and dependent upon some performance by the other (or on some other fact or event)? If the answer to this question is yes, we have found that the specified performance is a condition of duty, but we have not found that anyone has promised that the performance will take place.

3A *Corbin on Contracts* § 633 at p. 32 (emphasis added).

---

4. Comment d accompanying *Restatement 2d.* § 227(2), states: The rule in Subsection (2) states a preference for an interpretation that merely imposes a duty on the obligee to do the act and does not make the doing of the act a condition of the obligor's duty. The preferred interpretation avoids the harsh results that might otherwise result from the non-occurrence of a condition and still gives adequate protection to the obligor under the rules of Chapter 10 relating to performances to be exchanged under

an exchange of promises. Under those rules, particularly §§ 237–41, the obligee's failure to perform his duty has, if it is material, the effect of the non-occurrence of a condition of the obligor's duty. Unless the agreement makes it clear that the event is required as a condition, it is fairer to apply these more flexible rules. The obligor will, in any case, have a remedy for breach. In many instances the rule in Subsection (1) will also apply and will reinforce the preference stated in Subsection (2).

With those guidelines in mind, this Court finds that the CRP contract between the debtor and CCC is a contract for mutual promises, and not a contract predicated upon conditions precedent. A number of significant provisions in the contract indicate that the parties intended to create a promise contract. For example, the contract states the obligations of the parties as mandatory duties each party "shall" undertake, not as obligations conditioned on the other party first satisfying its obligation. (Findings of Fact 8(a)–(i)) (CRP Contract Provision 3A–M). The contract also states that the contract was effective when signed by the parties. (Finding of Fact 8(n)) (CRP Contract Provision 28A). Hence, the Court believes that the parties intended the duties and obligations of the contract, including the duty of CCC to pay the debtor, to arise at the time they signed the contract and, not to be delayed by the satisfaction of conditions.

Furthermore, the contract contains a liquidated damages clause which allows CCC to suspend performance and recover specified damages from the debtor if the debtor fails to carry out the terms of the agreement. (Finding of Fact 8(1)) (CRP Contract Provision 23A(1)–(2)). If the parties truly intended the contract to be conditional, there would be no need for a liquidated damages provision because if the participant failed to satisfy a "condition precedent" then the contract would never have become enforceable. Hence, the contract never could be breached and give rise to damages. Here, however, the liquidated damages provision indicates that the debtor's failure to perform a term of the contract is a failure to perform a duty based upon a binding promise. In short, damages for breach are available only when a binding promise contract exists and not when a contract predicated upon unfulfilled conditions precedent exists. *See Union Story Trust & Savings Bank v. Sayer*, 332 N.W.2d 316, 322 (Iowa 1988) (noting that damages are remedy for breach of promise, whereas the cancellation of duties results when conditions fail to occur). Other courts also have been persuaded that liquidated damage clauses indicate the parties' intent to create a promise contract. *Matthieson*, 63 B.R. at 60 (citing *In re Lee*, 35 B.R. 663, 665 (Bankr.N.D. Ohio 1983)).

Moreover, and perhaps most persuasively, the CRP contract contains a clause (Findings of Fact 8(1)) which sets out a detailed explanation about the reasons for including the liquidated damages provisions. The explanatory provision specifically indicates that once the contract is signed CCC will be operating under the assumption that it can rely on the participants to perform their obligations under the contract. (CRP Contract Provision 23(A)(3)). As *Corbin* has pointed out, the critical element for determining whether a contract is a contract based on conditions is whether the terms were "intended to be an assurance by one party to the other that some performance by the first would be rendered in the future and that the other could rely upon it." 3A *Corbin on Contracts* § 633 at 32. Here, the explanatory provision at 23(A)(3) indicates in a definitive manner that the parties viewed the terms of the CRP contract as a promise contract whereby the debtor assured CCC that he would render future performance that CCC could rely upon.

The very structure of the contract, requiring yearly payments by CCC, and continuous performance by the debtor in maintaining vegetative cover, implementing the conservation plan, etc., do not conform to standards for a contract based on conditions precedent. The contractual language indicates that CCC's obligation to pay each year is in return for the full performance of the 10 year commitment from the debtor to keep the land out of production. The terms of the contract very carefully note that CCC bargained for the full performance of the 10 year commitment, as anything else would under-cut the conservation purpose of the CRP programs.

The *Walat Farms* line of cases confuse CCC's right to suspend performance upon debtor's breach with the idea that CCC is not bound until the debtor satisfies conditions precedent in the contract. Those cases appear to operate under the assumption that simply because CCC has the right

to withhold payment if the debtor does not perform his obligations under the contract, the contract is conditional and CCC's obligation does not arise until the debtor satisfies the conditions postpetition. *See, e.g., Gore,* 124 B.R. at 78; *Evatt,* 112 B.R. at 419; *Evatt,* 112 B.R. at 411.

This assumption, however, fails to account for the remedies available to a nonbreaching party under a promise contract. Under a binding promises contract if one party breaches, then the nonbreaching party is entitled both to suspend its performance (if the breach is material) and to sue for damages (regardless of the degree of materiality). *See Restatement 2d of Contracts* §§ 235–237 (and accompanying commentary).[5] *See also Decker v. Juzwik,* 121 N.W.2d at 662. Under § 237 of the *Restatement 2d.,* CCC is allowed to suspend performance upon the debtor's breach of the promise contract, as long as the debtor's breach is material. *See Restatement 2d. of Contracts* § 241 (elements to determine when breach is material absent indication in contract); *see also Decker v. Juzwik,* 121 N.W.2d at 662. Here, the contractual language at provision 23(A)(3) specifies the reasons that any failure to perform by the debtor must be considered a material breach. Hence, this Court concludes that CCC's ability to suspend performance here does not make this a contract subject to conditions precedent. Rather, that provision is fully consistent with the Court's conclusion that this is a contract for promises.

Based on the foregoing, this Court concludes that the CRP contract does not become a postpetition contract giving rise to postpetition obligations simply because the debtor assumed it as an executory contract. CCC's debt to the debtor arose prepetition, and was "absolutely owed" prepetition.

## II. *The Effect of Assuming the CRP Contract on the Mutuality Requirement Under § 553.*

The debtor also argues here that § 553's requirement of mutuality is destroyed when he assumes the CRP contract under his plan of reorganization. The *Gore* case summarizes the debtor's mutuality argument as follows:

> Where a debtor-in-possession assumes an executory contract, the debtor-in-possession, rather than the prepetition debtor, becomes obligated to perform under the contract and any postpetition right to benefits under the contract accrues to the debtor-in-possession rather than to the prepetition debtor. *Evatt,* 112 B.R. at 413–14; *In re Fryar,* 93 B.R. 101, 104 (Bankr.W.D.Tex.1988); *Walat Farms,* 69 B.R. at 531. A postpetition debtor-in-possession does not stand in the same shoes as a prepetition debtor for off-set purposes. *Evatt,* 112 B.R. at 414. The change in capacity upon the filing of the Chapter 12 petition destroys the mutuality of the obligations. *Fryar,* 93 B.R. at 104.

124 B.R. at 78. As the above quotation from the *Gore* case indicates, the courts build this lack of mutuality argument upon the theory that the debtor and the debtor-in-possession are separate or different entities. *Walat Farms,* 69 B.R. at 530 (quoting 4 *Collier on Bankruptcy,* ¶ 553.08, p. 553–37 (15th Ed.1986)); *Evatt,* 112 B.R. at 414 (adopting *Walat Farms* rationale).

CCC points out, however, that the U.S. Supreme Court previously has rejected the separate or different entity theory in *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984). The *Bildisco* Court observed that if the debtor-in-possession:

> were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts,

---

5. *Restatement 2d.* § 235(2) notes that "[w]hen performance of a duty under a contract is due any non-performance is a breach." Comment b accompanying § 235 says "anything short of full performance is a breach." Comment a of § 236 states that "[e]ach breach gives rise to a claim for damages, and may give rise to other remedies." Section 237 then provides that "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."

since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing.

465 U.S. at 528; 104 S.Ct. at 1197. A number of courts subsequently have found that the above quoted language from *Bildisco* effectively has invalidated the new entity theory in bankruptcy. *In re Ontario Locomotive & Ins. Ry. Supplies,* 126 B.R. 146, 147 (Bkrtcy.W.D.N.Y.1991) (Observing that the *Bildisco* court "would appear to have laid to rest the 'separate entity' doctrine for all time."); *Affiliated Food Stores,* 123 B.R. at 748–49 (discussing *Bildisco* and citing to numerous other cases rejecting the new entity theory); *In re Mohawk Industries, Inc.,* 82 B.R. 174, 176–77 (Bankr.D.Mass.1987) (new entity theory no longer supported after *Bildisco*). The *Affiliated Food Stores* case specifically rejected the theory in a § 553 setoff analysis.

In spite of the pronouncements of the Supreme Court, however, a number of cases and the debtor here have continued to subscribe to the new entity approach in § 553 cases even after *Bildisco* was decided in 1984. *See, e.g., Gore,* 124 B.R. at 78; *Evatt,* 112 B.R. at 413–14; *Fryar,* 93 B.R. at 104 (vacated by *Fryar,* 113 B.R. at 318); *Walat Farms,* 69 B.R. at 531. However, none of these cases mention the passage from *Bildisco* rejecting the new entity approach. Other cases, and a well-respected bankruptcy treatise still apply the new entity approach, or some form of it, either by attempting to limit the reach of *Bildisco* or to limit the breadth of the new entity theory. *E.g., Patton v. John Deere Co. (In re Durham),* 87 B.R. 300, 302 (Bankr.D.Del. 1988) (limiting *Bildisco* to § 365 cases); 4 *Collier on Bankruptcy,* ¶ 553.08[1] at 553–45–46 (15th ed. 1991) (modifying the new entity theory by limiting it to the new capacity of the debtor-in-possession). The *Colliers Treatise,* for example, states that:

. . . in light of more recent comments by the United States Supreme Court, it may be more defensible to attribute the lack of mutuality to the new fiduciary *capacity* of the trustee or debtor in possession rather than to the somewhat formalistic notion that a new *entity* has sprung into being.

¶ 553.08 at 553–45–46.

This Court agrees with the *Ontario Locomotive* case that *Bildisco* has "laid to rest the 'separate entity' doctrine for all time." 126 B.R. at 147. This Court believes that the language of *Bildisco* is unambiguous and intended to put a stop to the rather artificial and fictitious distinctions between the debtor-in-possession and the debtor. The use of the term debtor-in-possession in the Bankruptcy Code supports this Court's application of *Bildisco.* *See* § 1101(1) (" 'debtor-in-possession' means debtor"). In light of this authority, this Court cannot accept the debtor's mutuality arguments.

Even if the Court were to assume, *arguendo,* that the *Bildisco* case was not controlling or could be distinguished, the Court still must conclude that the debtor's mutuality arguments are without merit. First, it must be noted that courts finding a lack of mutuality under the new entity approach have relied heavily on the idea that assuming an executory contract creates a postpetition contract under which the creditor's debt arises postpetition. Those courts apparently believe that the creditor's debt arises postpetition and, thus, is due and owing to the debtor-in-possession after the debtor-in-possession satisfies the conditions precedent in the contract. Because this Court already has decided that the obligation of CCC to the debtor arose prepetition, the Court is not convinced that the rationale of the *Walat Farms* line of cases would even retain vitality in this mutuality analysis.

Moreover, the statutory language and structure of § 553 do not support the debtor's mutuality argument or the result it brings. Essentially, if the Court accepts the debtor's argument, any time a bankruptcy debtor assumes an executory con-

tract the assumption itself would destroy mutuality and a § 553 setoff would be unavailable. There is no language in § 553 or its legislative history which indicates that the Congress ever intended setoff to be limited only to cases not involving executory contract relationships. The only limitations on the right to setoff are specified under § 553; mutuality and prepetition obligations. Other than those specified limitations, Congress intended to preserve setoff rights in bankruptcy. *See Cohen v. Savings Bldg. & Loan Co., (In re Bevill, Bresler & Schulman Asset Mgmt.)*, 896 F.2d 54, 57 (3rd Cir.1990) (Congress intended to preserve common law right to setoff); *I.R.S. v. Norton*, 717 F.2d 767, 772 (3rd Cir.1983) (same). Here, CCC had a valid prepetition right to setoff because at the time the debtor filed his bankruptcy, CCC owed the debtor a debt which was mutual and arose prepetition. This Court concludes that the statute intended to preserve that right and that the executory contract provisions of § 365 were not intended to inhibit that right in any way.

A careful reading of the specified limitations on setoff under § 553(a) (mutuality and a prepetition debt) also support the conclusion that the new entity theory is not in line with the terms of § 553. The plain language of § 553(a) serves to prohibit setoff when the "debt owing by the creditor to the debtor arose after the commencement of the case." Hence, when a debt arises postpetition with the postpetition "debtor-in-possession," the language requiring a debt arising prepetition already serves to prevent the setoff. There is no need under the statute to utilize the mutuality requirement to prevent the setoff based on a distinction between the capacity or entities of debtor-in-possession and the debtor. If Congress intended mutuality to be read so broadly it would not have served any purpose to include a requirement that the debt arose prepetition. Such an interpretation of mutuality under § 553 would render the prepetition debt requirement meaningless in this analysis. This Court, however, is guided by the maxim of statutory construction that a statute should be interpreted to give all parts meaning. *See, e.g., State v.*

*Baudler*, 349 N.W.2d 493, 496 (Iowa 1984); *Loras College v. Iowa Civil Rights Comiss.*, 285 N.W.2d 143, 148 (Iowa 1979). Hence, the Court will read the mutuality requirement and the requirement that the debt arose prepetition, as having independent force and meaning.

The Court concludes the mutuality requirement is properly interpreted and applied as dealing with the prepetition time frame only. Essentially, § 553(a) requires that a party who is asserting setoff against the estate must be the same party which absolutely owed the debtor the prepetition debt. *In re Express Freight Lines, Inc.*, 130 B.R. at 291 (pinpointing time arose is key for mutuality, if prepetition then mutuality is established). Here, if the creditor absolutely owed the debt to the debtor prepetition, the only question for mutuality purposes would be whether the party asserting setoff is the same party who absolutely owed the obligation prepetition. *See Cohen v. Savings Building & Loan Co. (In re Bevill, Bresher & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 59 (3rd Cir. 1990). Mutuality read in that manner would still have force and meaning as it would prevent parties who are not mutual parties to the prepetition debt from attempting to setoff their prepetition claims. This reading of § 553 gives mutuality independent force and meaning but also keeps the mutuality requirement from "swallowing up" the requirement that the creditor's debt to the debtor arises prepetition.

In summary, the Court rejects the debtor's arguments that § 553(a) mutuality is lacking here. The Court finds that CCC's debt to the debtor was mutual at the time it arose, and that is all that § 553 requires. The right to setoff was fixed at that prepetition time and is preserved by § 553. The act of assuming the CRP contract postpetition does not affect the analysis in this case.

III. *The Court's Ability to Exercise Discretion and Refuse to Allow Setoff When All Necessary Elements of § 553 Have Been Met.*

The debtor's final argument here is that even if all of the statutory elements of

§ 553 are satisfied, the Court should exercise its discretion and refuse to allow the setoff because it would substantially hinder the debtor's ability to reorganize. CCC has taken no position on this issue.

■ As one court has noted "[w]hile setoffs are generally favored, they are not automatically permitted." *In re Nielson*, 90 B.R. 172, 174 (Bankr.W.D.N.C.1988); *In re Utica Floor Maintenance, Inc.*, 41 B.R. 941, 944 (N.D.N.Y.1984). The courts almost universally agree that "[t]he application of setoff ... is permissive and lies within the equitable discretion of the trial court." *Duvoisin v. Foster (In re Southern Indus. Bankruptcy Corp.)*, 809 F.2d 329, 332 (6th Cir.1987); *Bevill, Bresler, & Schulman Asset Mgmt.*, 896 F.2d at 57; *I.R.S. v. Norton*, 717 F.2d at 772; *Homan v. Kemba Cincinnati Credit Union (In re Homan)*, 116 B.R. 595, 602 (Bankr.S.D. Ohio 1990); *Blanton v. Prudential–Bache Securities (In re Blanton)*, 105 B.R. 321, 336–37 (Bankr.E.D.Va.1989); *Nielson*, 90 B.R. at 174. The court in the *Southern Indus. Bankruptcy* case went so far as to note that "when justice dictates, setoff must be denied." 809 F.2d at 332.

Most courts believe that this equitable discretion, while not spelled out in the statute, essentially was enacted as part of § 553. As the court pointed out in *I.R.S. v. Norton:*

> This provision is not an independent source of law governing setoff; it is generally understood as a legislative attempt to preserve the common-law right of setoff arising out of nonbankruptcy law ... The broad equitable discretion of the courts in recognizing setoff rights defined by the common law has been carried over to the Bankruptcy Act of 1978 and in particular to section 553, whose language is permissive, not mandatory. "Its application, when properly invoked before a court, rests in the discretion of that court, which exercises such discretion under the general principles of equality." 4 *Collier on Bankruptcy* § 553.02, at 553–11 (15th ed. 1983).

717 F.2d at 772. Hence, this Court believes that applying equitable discretion in this analysis comports with the statutory scheme of § 553.

■ However, setoff also is recognized as a right "which is grounded in fairness." *Turner v. U.S. (In re Omni Corp.)*, 835 F.2d 1317, 1318 (10th Cir.1987) (also noting that "it would be unfair to deny a creditor the right to recover an established obligation while requiring the creditor to fully satisfy a debt to the debtor"). This principle has lead some courts to observe that courts should not deny setoff "merely because it would provide [what the court perceives as] an unjust result." *Blanton*, 105 B.R. at 337 (citing *New Jersey Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*, 576 F.2d 952, 957 (2d Cir.1978)); *see also Nielson*, 90 B.R. at 174 (noting "court's discretion is not unbounded"). Hence, courts generally have restrained the use of equitable discretion in prohibiting otherwise valid setoffs to two general categories of case. One class of cases is where the creditor committed an inequitable, illegal, or fraudulent act, or the setoff is against public policy. *Blanton*, 105 B.R. at 337; (and cases cited therein). The other class of cases is where the setoff would significantly harm or destroy the debtor's ability to reorganize. *Blanton*, 105 B.R. at 337 (and cases cited therein); *Utica Floor*, 41 B.R. at 944–45; *Nielson*, 90 B.R. at 175; *Mass. v. Dartmouth House Nursing Home, Inc. (In re Dartmouth House Nursing Home, Inc.)*, 24 B.R. 256, 265 (Bankr.D.Mass.1982); *see also In re Hazelton*, 85 B.R. 400, 405 (Bankr.E.D.Mich. 1988) (rev'd on other grounds, 96 B.R. 111 (E.D.Mich.1988). This concern arises only in a reorganization case, not in Chapter 7. *See Express Freight Lines*, 130 B.R. at 293.

The debtor does not allege that any such inequitable conduct or policy problem should prevent setoff here. The debtor does contend, however, that allowing setoff would significantly harm his ability to reorganize. He asks the Court to deny setoff on those grounds.

■ The debtor relies on decisions which have denied setoff completely in Chapter 12 cases "because allowing the setoff is

inconsistent with the purposes of Chapter 12 and the rehabilitation of American farmers." *In re Hazelton,* 85 B.R. 400, 405 (Bankr.E.D.Mich.1988) (rev'd on other grounds, 96 B.R. 111 (E.D.Mich.1988). However, the better rule appears to be that when a court finds that the setoff would harm the debtor's chances for a successful reorganization, that court simply should defer rather than deny setoff. *Blanton,* 105 B.R. at 321 (and cases cited therein); *Utica Floor,* 41 B.R. at 945–46. Moreover, where "the creditor is denied the immediate right of setoff ... the setoff claim is treated as a secured claim as provided by Bankruptcy Code Section 506(a)." *Blanton,* 105 B.R. at 321; *see also Braniff,* 814 F.2d at 1034–35 (noting that setoff claim is treated as secured claim under § 506(a)); *In re Delta Energy Resources, Inc.,* 67 B.R. 8, 10–11 (Bankr.W.D.La.1986) (quoting legislature history in observing "an amount subject to setoff is sufficient to recognize a secured status in the holder of such rights."). The *Blanton* court concludes that "[a]s a secured creditor, the setoff claimant may be entitled to relief from the stay and to proceed to setoff if the debtor cannot provide adequate protection." 105 B.R. at 337 (citing *In re Chestnut Co., Inc.,* 39 B.R. 519 (Bankr.D.S.C.1984) and *Massachusetts v. Dartmouth House Nursing Home, Inc., (In re Dartmouth House Nursing Home, Inc.),* 24 B.R. 256, 265 (Bankr.D.Mass. 1982)).

However, before the Court can consider deferring or denying setoff, the Court needs a proper factual basis to make that determination. *Utica Floor,* 41 B.R. at 945. The *Utica Floor* case explicitly noted "given the strong policy favoring setoff and the requirement of compelling reasons to defer that right, a ... substantial explanation of the factual basis for that conclusion is necessary." 41 B.R. at 945 (citation omitted). Here, there is nothing in the stipulation the parties submitted which indicates that they agree setoff would seriously harm the debtor's chances to reorganize.[6]

■ Based on the absence of any stipulated agreement that the setoff would sig-

nificantly harm the debtor's chances for a successful reorganization, the Court must deny the debtor's request to disallow setoff on equitable grounds. The stipulated facts represent the entire factual record before the Court, and the entire factual record upon which CCC agreed to have the case decided. If the debtor wishes to present a factual record to support this argument, then he must do so by a subsequent motion and give CCC a chance to respond and be heard.

### Conclusion

CCC is entitled to relief from the automatic stay in order to perfect a setoff under § 553. All of the statutory elements for setoff are satisfied in this case and setoff is thus appropriate. The Court will not exercise its equitable discretion and refuse to allow setoff because there is no factual record upon which such an equitable remedy can be based.

### ORDER

IT IS THEREFORE ORDERED that the CCC's motion for relief from the automatic stay in order to exercise a § 553 setoff is granted.

DONE AND ORDERED.

---

**6.** That allegation comes only in the brief of the debtor.